**Alec NAIMAN, Plaintiff,**

v.

**NEW YORK UNIVERSITY
HOSPITALS CENTER,
Defendant.**

**No. 95 CIV. 6469(RPP).**

United States District Court,
S.D. New York.

Jan. 7, 2005.

Ronald S. Kahn, New York City, for Plaintiff.

Law Office of Alan J. Rich, Alan J. Rich, Esq., Baree Fett, Esq., New York City, for Respondent.

**OPINION & ORDER**

PATTERSON, District Judge.

The Plaintiff, Alec Naiman ("Naiman"), sought money damages and injunctive relief under Title III of the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12181–12189, the Rehabilitation Act, 29 U.S.C. §§ 794–94a, the New York State Human Rights Law, N.Y. Exec. Law §§ 290–301, and the New York City Civil Rights Law, N.Y.C. Admin.Code §§ 8–101 to 8–807, against New York University Hospitals Center (the "Center") for failing to provide him with qualified sign-language interpreters on five separate occasions when he sought medical treatment at one of the Center's hospitals. On July 23, 2002, the parties entered into a Consent Decree and Release, which provided, *inter alia,* that the Center would deliver a check for $527,500 payable to Naiman and the Law Offices of Alan J. Rich for full settlement of all claims for money damages, costs, and attorney's fees. The Consent Decree and Release also provided that the Center would pay the Law Offices of Alan J. Rich reasonable attorney's fees incurred from March 8, 2002 until the date the parties executed the Consent Decree and Release.

On December 24, 2003, Naiman moved for an order directing Alan J. Rich, Esq. ("Rich"), his attorney in the underlying case against the Center, to pay Naiman the balance of the moneys due and owing to him under a 1994 retainer agreement. Rich responded on February 26, 2004, denying that the retainer agreement existed and cross moving to disqualify Naiman's current attorney, Ronald Kahn. This Court denied the cross motion after hearing argument on March 17, 2004.

After receiving Rich's response papers and Naiman's reply papers regarding Naiman's motion for the balance of the mon-

eys due and owing to Naiman, this Court issued an Order on May 12, 2004, stating that it would treat Naiman's motion as a motion for summary judgment and ordering Naiman and Rich to submit Local Rule 56.1 statements.[1] Naiman filed a 56.1 Statement of Material Facts on July 1, 2004, to which Rich responded with a cross motion requesting (1) a deferment on Naiman's motion so that limited discovery could be conducted; and (2) a continuance of Rich's submission of his response to Naiman's 56.1 Statement and the requested statement of hours. This Court issued an Order on August 5, 2004, denying Rich's request for discovery and directing Rich to respond to Naiman's Local Rule 56.1 Statement of Material Facts so that the Court could determine whether discovery was required. Rich filed a Local Rule 56.1 Statement on August 19, 2004.[2] For the reasons that follow, discovery is not necessary and Naiman's motion is granted.

## BACKGROUND

On or around January 10, 1994, Naiman, a deaf person, retained Rich to represent him in an action against the Center after Naiman was not provided with a sign-language interpreter on five occasions when he sought medical treatment at one of the Center's hospitals. (Naiman's Local Rule 56.1 Statement ("Naiman's 56.1 Stmt.") ¶ 1.) On that date, Naiman executed a written retainer agreement that provided that Rich would "prosecute or adjust a claim for damages arising from personal injuries sustained by Alec Naiman, on Nov. 16, 1993." (Retainer Agreement between Naiman and Rich dated Jan. 10, 1994, attached as Ex. A to Rich's Local Rule 56.1 Statement ("Rich's 56.1 Stmt.").)

In exchange for Rich's legal representation, the retainer established the following fee arrangement:

The client agrees to pay you, and you are authorized to endorse for the undersigned checks that may be paid in settlement of this action, and to retain out of any moneys that may come into your hands by reason of the above claim, based on the following attorney fee schedule:

Thirty three and one-third percent (33⅓%) on the sum recovered;

Attorney is also entitled to such fee as is awarded pursuant to Federal law.

Such percentage is computed on the net sum recovered after deducting and repaying to the attorneys disbursements in accordance with Rules of Appellate Division, First Department.

In the event extraordinary services are required, application may be made to the court for greater compensation pursuant to the provisions of subdivision (d) of Rule 4 of Special rules regulating the conduct of attorneys, Appellate Division: First Department.

(*Id.*) Since entering into the agreement, Rich has not made an application to a court for greater compensation, nor has he applied for an award of attorney's fees under federal law.

At a conference on January 24, 2002, this Court informed the parties that they had until the following Friday to settle the case and set a trial date for March 2002. Five days later—prior to beginning settlement negotiations with the Center—Rich sent Naiman a lengthy e-mail explaining

---

1. This Court had previously urged the parties to utilize the alternate dispute resolution process on attorney's fees disputes offered by the Association of the Bar of the City of New York, but both parties rejected this suggestion.

2. Rich also submitted a copy of the 1994 retainer agreement which he previously claimed did not exist.

why the terms of their retainer agreement should be adjusted. (E-mail from Rich to Naiman dated Jan. 29, 2002, attached as Ex. D to Rich's 56.1 Stmt.) In the e-mail, Rich explained that if the case proceeded to trial and Naiman prevailed, federal civil rights law would permit the Court to order the Center to pay Naiman's attorney's fees. (*Id.*) Rich further explained that even if a jury ruled in Naiman's favor, Naiman might receive only nominal damages and the court could award a much larger sum for attorney's fees. (*Id.*) After stating that he did not "even know if the defendant is going to be in the right neighborhood to settle this case," Rich continued, "But, I want to raise the issue that when I negotiate, I need to take into account my fee, which might be by our understanding, be something greater than 1/3 of the entire settlement." (*Id.*) Rich went on to state:

> After we settle the money damages side of the case, I have no idea how much work would be involved in hammering out an agreement for the Court to approve on changes in policy, practice, training, etc. at the hospital.... As I would move forward with work on the "injunctive" modifications in policy, etc. the defendant hospital would be responsible for paying my fees for this future work. None of these fees would come out of the money damages settlement you get.

(*Id.*) Rich's e-mail also asked Naiman to "write to confirm that you are in agreement with my having the flexibility to move forward in view of the above framework.... I must ... be ready to have a serious negotiation with the lawyer for the hospital about settling between now and Friday afternoon's conference, so your prompt reply is necessary." (*Id.*) Neither Rich nor Naiman claim that Naiman replied to this e-mail. The parties advised the Court on March 8, 2002 that they had settled the issue of the amount of damages, subject to reaching an agreement on the injunctive relief.

According to Rich, at some time after he sent the January 29, 2002 e-mail, he and Naiman "explicitly agreed in-person that they would equally divide the $527,500 after the payment of expenses." (Rich's 56.1 Stmt. ¶ 26.) Rich further states that during settlement negotiations, "[w]hen defendant offered $527,500, Naiman specifically asked Rich how much he would receive personally under the 50–50 division they had discussed." (*Id.* ¶ 29.) Rich states that he told Naiman that he would receive a check for roughly $260,000. (*Id.*) Naiman, on the other hand, asserts that he never consented to a change in the retainer agreement. (Naiman's 56.1 Stmt. ¶ 12.)

Naiman and the Center executed a Consent Decree and Release on July 23, 2002, which provided, *inter alia*, that the Center would pay Naiman and Rich $527,500, inclusive of attorney's fees.[3] (Consent Decree and Release dated July 23, 2002, ¶ 45, attached as Ex. 1 to Naiman's Notice of Motion.) Rich received a check from the Center for $527,500 on or about August 1, 2002.[4] (Naiman's 56.1 Stmt. ¶ 10.) Between August 15, 2002 and October 7, 2002, Naiman made numerous attempts to contact Rich about his portion of the settlement award; in sum, Naiman sent three e-mails to Rich, telephoned Rich's office

---

**3.** Rich received a separate payment from the Center for his work in connection with the injunctive relief. That payment is not relevant to the instant motion.

**4.** According to the Consent Decree and Release, the check for $527,500 represents "full settlement of all claims for money damages, costs, disbursements, and attorneys' fees" that Naiman or Rich may have against the Center. (Consent Decree and Release ¶ 45.)

four times, and mailed Rich two letters requesting his share of the settlement. (E-mails, Letters, and TTY Transcripts from Naiman to Rich dated between Aug. 15, 2002 and Oct. 7, 2002, attached as Ex. 3 to Naiman's Notice of Motion.) On October 14, 2002, Rich mailed Naiman a check in the amount of $260,665.01. (Rich's 56.1 Stmt. ¶ 34.) Rich included a letter with the check, which stated in pertinent part:

> As per our supplemental agreement, my fee would be larger because of the extent of the work performed over the years and we agreed on a 50%–50% division after the payment of expenses.
>
> The expenses were some $8,189.99. Due to the delay, I paid an additional $2,000 of that amount, reducing the expenses to $6,189.99, thereby increasing your share. The client share and the enclosed check is for $260,655.01.

(Letter from Rich to Naiman dated Oct. 14, 2002, attached as Ex. G to Rich's 56.1 Stmt.)

On February 19, 2003, Naiman sent Rich an e-mail concerning Rich's division of the settlement money. Naiman wrote, "From the beginning your fee was to be one-third of the settlement amount, and absent certain conditions which did not in fact obtain (such as a very small award) I have not agreed to any other division nor do I now." (E-mail from Naiman to Rich dated Feb. 19, 2003, attached as Ex. 5 to Naiman's Notice of Motion.) Rich's response to this e-mail, if he sent one, has not been provided by either party. Naiman ultimately filed the instant motion on December 24, 2003, requesting an order from this Court directing Rich to pay Naiman his alleged share of the Consent Decree and Release proceeds under the 33 ⅓ percent fee schedule established by the 1994 retainer agreement.

## DISCUSSION

 As a preliminary matter, federal district courts may exercise jurisdiction over fee disputes between litigants and their attorneys where, as here, the court has federal jurisdiction over the underlying action. *See Alderman v. Pan Am World Airways*, 169 F.3d 99, 101–02 (2d Cir.1999) (internal quotation marks and citation omitted); *see also In re Austrian & German Bank Holocaust Litig.*, 317 F.3d 91, 98 (2d Cir.2003) ("Whenever a district court has federal jurisdiction over a case, it retains ancillary jurisdiction after dismissal to adjudicate collateral matters such as attorney's fees."). To interpret and rule on contractual attorney's fee provisions, federal courts apply state law. *See Alderman*, 169 F.3d at 103 (citation omitted).

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A court deciding a motion for summary judgment must view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in his favor. *See Young v. County of Fulton*, 160 F.3d 899, 901 (2d Cir.1998). "When no rational juror could find in favor of the non-moving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo v. Prudential Residential Servs., Ltd. Partnership*, 22 F.3d 1219, 1223–24 (2d Cir.1994) (citation omitted).

## I. The 1994 Retainer Agreement

 Based solely on the terms of the retainer agreement, Rich was entitled to 33⅓ percent of the $527,000 settlement.

Even assuming that Naiman's case required Rich to provide "extraordinary services" during the course of his representation, no application to increase Rich's fee was made to any court during his representation of Naiman. Similarly, Naiman and Rich waived their eligibility for an award of attorney's fees under the fee-shifting provisions of the Americans with Disabilities Act[5] and the Rehabilitation Act[6] by accepting the terms of the Consent Decree and Release that terminated Naiman's suit against the Center.[7]

## II. The Alleged Supplemental Fee Agreement

Rich argues that he and Naiman reached a supplemental agreement during settlement negotiations, under which Rich was entitled to 50 percent of the settlement proceeds.[8] (Rich's Memorandum of Law in Opposition to Naiman's Motion Regarding Attorney's Fees, at 13–15.) According to Rich's most recent declaration, "In Court, [Rich and Naiman] agreed to a 50–50 division of the settlement proceeds as a matter of convenience in calculation."

(Declaration of Alan J. Rich dated Aug. 18, 2004, ¶ 22, attached as Ex. B to Rich's 56.1 Stmt.) Rich continues:

> When defendant offered $527,500, Naiman specifically asked me how much he would receive personally under the 50–50 division we had discussed. I clarified for Naiman how much he would receive according to a 50–50 division after costs, approximating that costs would be under $10,000. I advised that Naiman would receive a check for roughly $260,000. Naiman agreed to accept the proposed settlement of his claims in the case on this basis.

(*Id.* ¶¶ 25–26.)

Rich does not specify on what date he and Naiman entered into the supplemental agreement. However, insofar as Rich states that he discussed a 50–50 split with Naiman when the Center made its offer of $527,500, the supplemental agreement must have taken place prior to March 8, 2002, which is when the parties advised the Court that they settled the issue of damages subject to settlement of the claims for

---

5. The Americans with Disabilities Act provides: "In any action . . . commenced pursuant to this Act, the court . . ., in its discretion, may allow the prevailing party . . . a reasonable attorney's fee, including litigation expenses, and costs." 42 U.S.C. § 12205.

6. The Rehabilitation Act provides: "In any action . . . to enforce or charge or violation of a provision of this title, the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee as part of the costs." 29 U.S.C. § 794a(b).

7. Rich's inadequate record-keeping would have significantly reduced his recovery for attorney's fees had he applied for court-ordered compensation. According to the Second Circuit, "Applications for fee awards should generally be documented by contemporaneously created time records that specify, for each attorney, the date, the hours expended, and the nature of the work done." *Kirsch*

v. *Fleet St., Ltd.*, 148 F.3d 149, 173 (2d Cir. 1998) (citations omitted); *see also N.Y. State Ass'n for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1147–48 (2d Cir.1983) (announcing that "contemporaneous time records are a prerequisite for attorney's fees in this Circuit"). Here, in response to an Order from this Court, Rich revealed that only 128 of his 428 time entries are "original contemporaneous entries"—the other 300 were "recreated based on other documentation." (Rich's Time Records Printout, attached as Ex. A to Letter from Rich to the Court dated Oct. 12, 2004.)

8. Rich also claims that he was entitled to a larger proportion of Naiman's settlement under the lodestar calculation used in federal courts. (*Id.* at 12–13.) However, Naiman and Rich waived their eligibility for attorney's fees under the Americans with Disabilities Act and the Rehabilitation Act by accepting the terms of the Consent Decree and Release.

injunctive relief. Thus, the supplemental agreement was contingent on the parties reaching a final agreement. *See, e.g., Burlington v. Dague,* 505 U.S. 557, 561, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992) (a fee "is contingent if the obligation to pay depends on a particular result[ ] being obtained"). Therefore, the alleged supplemental agreement was subject to the rules governing contingency fee agreements.

■ It is well established that New York law requires attorneys to put contingency fee agreements in writing. The Disciplinary Rules of the Code of Professional Responsibility instruct an attorney employed in a "contingent fee matter" to "promptly ... provide the client with a writing stating the method by which the fee is to be determined, including the percentage or percentages that shall accrue to the lawyer in the event of settlement, trial, or appeal." D.R. 2–106(D), N.Y. Comp. Codes R. & Regs. tit. 22, § 1200.11(d). Both federal and state courts have held attorneys to this requirement.[9] *See Revson v. Cinque & Cinque, P.C.,* 221 F.3d 59, 68–69 (2d Cir.2000) (expressly agreeing with district court's ruling that contingent fee matters must be "detail[ed] for the client in writing" by the retained attorney); *Liner Tech. Inc. v. Hayes,* 213 A.D.2d 881, 883, 624 N.Y.S.2d 284, 285 (3d Dep't 1995) ("contingency fee agreement[s] ... must be in writing").

■ Even when viewing the facts in a light most favorable to Rich, Rich failed to comply with the requirements that govern contingency fee matters. Rich does not dispute that the first document to state a 50 percent contingency fee is his post-settlement letter to Naiman, dated October 14, 2002. That letter states, in relevant part, "As per our supplemental agreement, my fee would be larger because of the extent of the work performed over the years and we agreed on a 50%–50% division after the payment of expenses." (Letter from Rich to Naiman dated Oct. 14, 2002, attached as Ex. G to Rich's 56.1 Stmt.) Rich alleges that Naiman agreed to a 50 percent contingency fee at some point prior to March 8, 2002[10]; however, he did not mail the letter documenting the agreement until on or about October 14, 2002. Thus, because Rich did not put the agreement in writing until over seven months after the parties allegedly entered into the agreement and over two months after the case settled, Rich did not "promptly" provide Naiman with a writing stating the terms of the agreement. Accordingly, Rich failed to satisfy New York law as it applies to contingency fee agreements and his claim for a 50 percent contingency fee is not enforceable.

This outcome is consistent with the scrutiny New York courts apply to midstream modifications to fee agreements. In *Baye v. Grindlinger,* the Appellate Division, Second Department, observed:

> The rule is well established that as to contracts made between an attorney and

9. In fact, New York courts have cited an attorney's violation of D.R. 2–106(D) among examples of professional misconduct in disciplinary proceedings. *See, e.g., In re Perrini, Jr.,* 232 A.D.2d 138, 144, 662 N.Y.S.2d 445, 449 (1st Dep't 1997); *In re Alcide,* 232 A.D.2d 127, 129, 662 N.Y.S.2d 59, 60 (2d Dep't 1997); *In re Henry,* 221 A.D.2d 32, 37, 643 N.Y.S.2d 603, 606 (2d Dep't 1996); *In re Raphael,* 216 A.D.2d 788, 789, 628 N.Y.S.2d 846, 847 (3d Dep't 1995).

10. According to Rich's August 18, 2004 declaration, Rich and Naiman agreed to the 50 percent contingency fee at some time after Rich's January 29, 2002 e-mail but before the parties settled the issue of money damages in March 2002, subject to agreement on the injunctive terms of the Consent Decree and Release.

his client subsequent to employment which are beneficial to the attorney, *it is incumbent on the attorney to show that the terms are fair and reasonable and fully known and understood by the client.*

78 A.D.2d 690, 690, 432 N.Y.S.2d 624, 625 (2d Dep't 1989) (citations omitted) (emphasis added); *see also In re Howell,* 215 N.Y. 466, 472, 109 N.E. 572 (1915) (stating that midstream modifications of retainer agreements must be "carefully scrutinized"). Moreover, New York law is generally hostile to midstream efforts to increase a contingency fee percentage. *See, e.g.,* N.Y. Comp.Codes R. & Regs. tit. 22, § 603.7(e)(4) (limiting opportunities for attorneys to increase contingent fee percentages in certain types of actions brought in the First Department); *Belzer v. Bollea,* 150 Misc.2d 925, 928–29, 571 N.Y.S.2d 365, 367 (N.Y.Sup.Ct.1990) (rejecting contingent fee increase that did not comport with N.Y. Comp.Codes R. & Regs. tit. 22, § 603.7(e)(4) regardless of "whether the client in fact agreed or disagreed to additional fees, and no matter how sterling the representation may have been to the time of trial"). Furthermore, a midstream modification that increases a contingency fee percentage may be a "business trans-

action" that creates a conflict of interest between the attorney and the client.[11] In such situations, New York Disciplinary Rule 5–104(A) requires an attorney to take specified precautionary measures, which include advising the client to seek advice from independent counsel and obtaining the client's written consent after full disclosure.[12] Taken together, these provisions provide further support for the conclusion that Rich's failure to document promptly the alleged supplemental agreement raising his contingency fee to 50 percent of the settlement proceeds is fatal to its enforceability.

▮ Lastly, Rich argues that Naiman consented to the 50 percent contingency fee by cashing the check and waiting four months before contacting Rich to dispute the fee fails as well. Where, as here, an attorney delivers a client's property to the client, "[t]o hold that such delivery impliedly establishes an accord as to a client's claim not then asserted or the subject of dispute is incompatible with the attorney-client fiduciary relationship." *McMahon v. Pfister,* 39 A.D.2d 691, 691, 332 N.Y.S.2d 591, 592 (1st Dept.1972). Thus, because Rich and Naiman were still engaged in an

11. Courts have not ruled on whether midstream modifications of contingency fee agreements in fact create conflicts of interest under the New York Disciplinary Rules. *See generally* Roy Simon, *Changing a Fee Agreement in Midstream,* N.Y. Prof. Resp. Rep., May 2004, at 3 ("the question of whether and when D.R. 5–104(A) applies [to post-engagement changes to fee agreements] remains unsettled"); *but see In re Stamell,* 252 B.R. 8, 17 (Bkrtcy.E.D.N.Y.2002) (citing D.R. 5–104(A) when scrutinizing a midstream change to a retainer agreement).

12. D.R. 5–104(A) provides the following:
A lawyer shall not enter into a business transaction with a client if they have differing interests therein and if the client expects the lawyer to exercise professional judgment therein for the protection of the client, unless:
(1) The transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and fully disclosed and transmitted in writing to the client in a manner that can be reasonably understood by the client;
(2) The lawyer advises the client to seek the advice of independent counsel in the transaction; and
(3) The client consents in writing, after full disclosure, to the terms of the transaction and to the lawyer's inherent conflict of interest in the transaction.
D.R. 5–104(A), N.Y. Comp.Codes R. & Regs. tit. 22, § 1200.23(a).

attorney-client relationship, Rich's argument must fail.

## CONCLUSION

Naiman's motion for an order directing Rich to pay Naiman the balance of the moneys due and owing to Naiman is granted. Rich is ordered to provide Naiman with the withheld share of the $527,500 check he received from the Center, plus interest from August 1, 2002 to date, within 10 days of receipt of this Opinion & Order.

IT IS SO ORDERED.