[853 NYS2d 1]

ALICE LAWRENCE, Appellant, v GRAUBARD MILLER et al., Respondents. In the Matter of the Estate of SYLVAN LAWRENCE, Deceased. GRAUBARD MILLER, Respondent; ALICE LAWRENCE et al., Appellants. In the Matter of the Estate of SYLVAN LAWRENCE, Deceased. GRAUBARD MILLER et al., Respondents; ALICE LAWRENCE, Appellant.

First Department, November 27, 2007

### APPEARANCES OF COUNSEL

*Greenberg Traurig LLP*, New York City (*Leslie D. Corwin, Israel Rubin* and *Stephanie R. Feldman* of counsel), for Alice Lawrence, appellant.

*Greenfield Stein & Senior, LLP*, New York City (*Norman A. Senior, Gary B. Friedman* and *Jamie R. Dyce* of counsel), for Richard Lawrence, appellant.

*Flemming Zulack Williamson Zauderer LLP*, New York City (*Mark C. Zauderer* of counsel), for Graubard Miller, respondent.

*Graubard Miller*, New York City (*C. Daniel Chill, Elaine M. Reich* and *Steven Mallis* of counsel), respondents pro se.

### OPINION OF THE COURT

ANDRIAS, J.P.

In these appeals arising from a Surrogate's Court proceeding to determine what legal fees are due to the law firm of Graubard Miller for its representation of Alice Lawrence and her son Richard Lawrence in connection with the estate of her late husband, the principal issue presented is whether a 2005 revised retainer agreement calling for Mrs. Lawrence to pay a contingency fee of 40% of any future monies distributed to the beneficiaries of the estate is unconscionable on its face. We find that,

while at first blush such agreement might arguably seem excessive and invite skepticism, before any determination regarding unconscionability can be made, the circumstances underlying the agreement must be fully developed, including any discussions leading to the agreement, as well as the prospects at that time of successfully concluding the litigation in favor of Mrs. Lawrence.

Sylvan Lawrence, the husband of respondent Alice Lawrence, died in 1981. His will left his estate to his wife and three children and was admitted to probate on January 29, 1982. Mr. Lawrence's brother was named executor and served in that capacity until his death in late 2003, after which the decedent's son, Richard Lawrence, succeeded him. In 1983, Mrs. Lawrence retained the Graubard firm to represent her in connection with her deceased husband's estate on an hourly fee basis, which retention was confirmed by letter dated August 4, 1983. Thereafter, the Graubard firm billed Mrs. Lawrence over $18 million in legal fees incurred in litigation instituted against the executor of the estate concerning his administration of the estate, as well as other matters. During that period more than $350 million in distributions were made to the beneficiaries of the estate. In addition, in December 1998, Mrs. Lawrence paid three of the firm's partners bonuses or gifts totalling over $5 million, plus approximately $2.7 million in gift taxes on such payments.

In November 2004, according to Mrs. Lawrence, she noticed that her legal bills were increasing to almost $1 million per quarter and asked about the possibility of entering into a new fee arrangement. As a result, in January 2005, a modified retainer agreement was entered into which provided, in pertinent part, that, commencing January 1, 2005, the firm would continue to bill Mrs. Lawrence on an hourly basis for services rendered with an annual cap of $1.2 million, exclusive of disbursements. In the event any additional monies were distributed to the beneficiaries of the estate, or Mrs. Lawrence settled the litigation with the executor's estate, the Graubard firm was to be paid from Mrs. Lawrence's share of such monies 40% of the total distributed to the beneficiaries, minus the total amount previously paid by her pursuant to the one-year, $1.2 million retainer. Prior to the revised retainer agreement, Mrs. Lawrence had personally negotiated with her nephew, the late executor's son, and received a $60 million offer from the executor's estate, but such offer did not result in a settlement.

On May 18, 2005, about 4½ months after the modified retainer agreement was entered into, the Graubard firm reached

a settlement in the litigation against the former executor's estate in which it agreed to pay the Lawrence estate approximately $104.8 million. Shortly thereafter, Mrs. Lawrence retained new counsel and refused to pay the Graubard firm's fee.

On August 5, 2005, the Graubard firm filed a petition in Surrogate's Court to compel payment of its legal fees, asserting claims against Mrs. Lawrence for breach of the 2005 retainer fee agreement in the amount of 40% of not less than $110.3 million plus 40% of any additional sums paid to the estate, less $348,272.78 paid by Mrs. Lawrence to Graubard on May 6, 2005, together with statutory interest, or alternatively, quantum meruit legal fees in the same amount. The petition also asserted claims against the current executor, Richard Lawrence, for tortious interference with contract in inducing his mother's breach of the retainer agreement and to recoup for legal services benefitting the estate.

By order dated September 12, 2005, Surrogate Roth referred the petition to compel payment of legal fees to a Referee to hear and report. The next day, Mrs. Lawrence brought suit in Supreme Court for, inter alia, rescission of the revised retainer agreement, unjust enrichment, conversion, breach of fiduciary duty, breach of the covenant of good faith and fair dealing, an accounting, and declaratory relief. By order entered December 16, 2005, that action was removed to Surrogate's Court where it was also referred to the Referee. In the meantime, respondents Alice and Richard Lawrence moved before the Referee to dismiss the petition pursuant to CPLR 3211 and the Graubard firm cross-moved for partial summary judgment dismissing Mrs. Lawrence's counterclaim for a refund of all fees previously paid to the Graubard firm and three of its partners.

Alice Lawrence appeals from those orders that removed her Supreme Court action to Surrogate's Court, confirmed the Referee's report and denied her motion to dismiss the petition, and directed her to appear for her deposition. Richard Lawrence appeals from the order confirming the Referee's report.

Supreme Court appropriately removed Alice Lawrence's action for contract rescission, unjust enrichment, and related causes of action against her former attorneys to Surrogate's Court, which clearly has subject matter jurisdiction over the matter. The complaint in that action stems from her retention of the Graubard firm to represent her in litigation, spanning over 22 years, against the estate's former executor and her

claims against the individual defendants relate to "bonuses" or "fees" paid in relation to the estate administration and litigation. Moreover, there was already pending in Surrogate's Court the special proceeding brought by defendants against her to enforce their 2005 amended retainer agreement, in which proceeding she specifically raised the affirmative defense of unconscionability and sought, among other things, rescission of the retainer agreement, a declaration that it was unenforceable, and the return of over $18 million previously billed for services from 1983 through 2004 in connection with their representation of her in the matter of her late husband's estate. Although CPLR 325 (e) does not mandate removal, as noted by Supreme Court, the interests of judicial economy dictate a strong preference for removal to Surrogate's Court of all matters affecting the administration of a decedent's estate (*see Rosenman & Colin v Winston*, 205 AD2d 451 [1994]; *Birnbaum v Central Trust Co.*, 156 AD2d 309 [1989]).

■ As to appellants' claims that the revised retainer agreement is unconscionable on its face, the foregoing operative facts are not in dispute. What is in dispute are the circumstances surrounding the revision of the parties' retainer agreement and the value of the Graubard firm's services in effecting a final settlement of the decades-old litigation involving the distribution of the estate.

It is well settled that

> "[a] determination of unconscionability generally requires a showing that the contract was both procedurally and substantively unconscionable when made—i.e., some showing of an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party.

> "The procedural element of unconscionability requires an examination of the contract formation process and the alleged lack of meaningful choice" (*Gillman v Chase Manhattan Bank*, 73 NY2d 1, 10-11 [1988] [citations and internal quotation marks omitted]).

As concluded by the Referee, there is no authority for finding a 40% contingent fee unconscionable on its face. Generally, before a determination of unconscionability can be made, a full trial of the issues is required. As to Mrs. Lawrence's claim that

such fee is unconscionable because the entire amount was to be paid out of her share of the estate, the Referee found: "If Mrs. Lawrence understood this provision of the revised agreement and agreed to it, there is no reason why it should now provide a basis for finding the agreement invalid." The basic requirement in any retainer agreement is that it be fair and reasonable. In the case of an amended agreement, the attorney has the burden of showing that the client understood the terms of the agreement and that the attorney did not exploit the client's confidence in negotiating the terms of the agreement. As the Referee found: "Resolution of those issues will require evidence concerning all factors relevant to Mrs. Lawrence's capacity, her understanding of the terms of the revised agreement, the completeness of her attorneys' disclosure and whether they exploited their preexisting confidential relationship with her to obtain the favorable terms of the agreement."

Relying upon the Court of Appeals' recent decision in *King v Fox* (7 NY3d 181 [2006]), Mrs. Lawrence argues that dismissal is warranted where the retainer agreement is demonstrably unconscionable on its face. However, *King* merely holds that it is inherently difficult to determine the unconscionability of contingent fee agreements and it is not necessarily the agreed-upon percentage or the duration of the recovery that makes such a fee arrangement unconscionable, but the facts and circumstances surrounding the agreement, including the parties' intent and the value, in hindsight, of the attorney's services in proportion to the fees charged (*id.* at 192).

Mrs. Lawrence also argues that because she paid the Graubard firm over $18 million in hourly fees over the past 22 years, as well as "bonuses" or "gifts" to three of its partners of over $5 million, and paid over $2 million in gift taxes, the revised fee arrangement, which she concededly sought, is unconscionable because 4½ months later the litigation with her late brother-in-law, the executor of the estate, was settled for over $100 million (she concededly had personally negotiated a potential $60 million settlement prior to entering into the revised agreement, but that settlement never reached fruition). She also claims that no one in the Graubard firm advised her to consult independent counsel before revising her agreement; however, the Graubard firm disputes this and states that she was so advised.

In their reply brief, appellants argue for the first time that the Graubard firm's counterstatement of facts in its respondent's brief continually refers to its memorandum of law in the

Surrogate's Court as its only support for the majority of its alleged factual contentions; however, points raised for the first time in a reply brief, to which the adversary has no opportunity to respond, are not generally favored or accorded any credence. What is overlooked by appellants is that the parties charted their own procedural course in the Surrogate's Court and no objection was made to the Graubard firm's factual statements in its memorandum of law. Indeed, Mrs. Lawrence responded to the firm's statement in its legal memorandum that she had been advised to seek independent counsel by denying such allegations in her affidavit in support of her dismissal motion.

Any determination of unconscionability generally requires a showing of both procedural and substantive unconscionability, requiring an examination of the contract formation process and the alleged lack of meaningful choice (*Gillman v Chase Manhattan Bank*, 73 NY2d at 10-11). Mrs. Lawrence's numerous allegations of procedural unconscionability necessarily implicate issues of credibility and are insufficient to warrant dismissing the petition at this point since the agreement cannot be said to be unconscionable on its face as a matter of law. Moreover, since the Referee did not convert the motion to one for summary judgment, the Graubard firm was not required to lay bare its proof. The issue of unconscionability, as well as Mrs. Lawrence's claims that the so-called "bonuses" or "gifts," as well as the agreement itself, violated attorney disciplinary rules against self dealing, etc., cannot be resolved without determining Mrs. Lawrence's capacity (the fact that she was nearly 80, by itself, is insufficient to put her mental capacity into question); what she was advised; and whether she understood the ramifications of the revised agreement. Thus, the Referee correctly found that there are issues of fact militating against dismissal of the petition at this point. Moreover, until the question of the validity of the revised retainer agreement is resolved, Richard Lawrence's motion to dismiss the tortious interference with contract claim against him was properly denied.

■ Finally, with regard to Mrs. Lawrence's claim that the Referee went beyond the scope of the order of reference in ordering her deposition after he issued his report, the Referee was referred the "petition" and, subsequently, the Supreme Court action. Thus, his report on appellants' motions for dismissal, and the Graubard firm's cross motion for summary judgment, did not conclude his authority in the matter. Further, although the Surrogate cited CPLR 4301 ("Powers of referee to deter-

mine") rather than CPLR 4201 ("Powers of referees to report") when discussing the Referee's powers, CPLR 4201 specifically gives the Referee the power to "direct the parties to engage in and permit such disclosure proceedings as will expedite the disposition of the issues." While CPLR 4311 provides that a referee's powers "may" be specified and/or limited by the order of reference, no such limitation was placed on the Referee in this case. Since the Referee denied appellants' motion to dismiss and respondents' cross motion for summary judgment on the ground that the issues raised largely hinged upon facts not yet developed, it was wholly appropriate for the Referee to order that discovery proceed.

Accordingly, in the first appeal, the order of the Supreme Court, New York County (Helen E. Freedman, J.), entered December 16, 2005, which granted defendants' motion pursuant to CPLR 325 (e) to remove *Lawrence v Graubard Miller et al.* (NY County index No. 603257/05) to the Surrogate's Court, New York County, should be affirmed, without costs. In the second appeal, the order of the Surrogate's Court, New York County (Renee R. Roth, S.), entered July 12, 2006, which, to the extent appealed from as limited by the briefs, confirmed the Referee's report, dated May 16, 2006, recommending denial of respondents-appellants', Alice and Richard Lawrence, CPLR 3211 motion to dismiss the petition, should be affirmed, without costs. In the third appeal, the order of the Surrogate's Court, New York County (Renee R. Roth, S.), entered on or about October 4, 2006, which denied respondent Alice Lawrence's challenge of an order of the Special Referee directing her appearance at her deposition, should be affirmed, without costs.

CATTERSON, J. (dissenting). Because I believe that as a matter of law a legal fee of $40 million for five months' work following years of litigation which was fully compensated on an hourly basis is unconscionable, I respectfully dissent and would void the agreement embodying that fee. Further, because of the allegations by plaintiff that the defendants violated certain provisions of the Code of Professional Responsibility, I would refer the defendants to the Departmental Disciplinary Committee.

I cannot agree with the majority's view that the undisputed facts of this case are insufficient for a ruling of unconscionability as a matter of law. Specifically, it is undisputed that, for almost the entire year prior to January 2005, Graubard focused on litigating an accounting claim after Alice Lawrence (Alice)

declined a $60 million settlement offer on that claim. It is also undisputed that 4½ months after signing the modified retainer agreement containing the 40% contingent fee provision, Graubard finalized a settlement of approximately $100 million on the claim. It then sought $40 million as its contingent fee.

In other words, having billed Alice for every hour expended on work in connection with the claim after Alice left the $60 million offer on the table, Graubard now seeks to retain every dollar over and above that amount as its contingent fee, essentially divesting Alice of any benefit she may have gained from Graubard's legal services. The majority's contention that the circumstances underlying the agreement must be further fully developed is incomprehensible in the face of this substantive unconscionability.[1]

For these reasons as set forth more fully below, I believe that, the agreement embodying that fee should be declared void.

Sylvan Lawrence, the husband of Alice, died in 1981. The decedent's will left his estate to his wife and three children and was admitted to probate on January 29, 1982. The decedent's brother, Seymour Cohn was named executor and served in that capacity until his death in late 2003, after which Richard Lawrence (Richard), the decedent's son, succeeded him.

Defendant Graubard was retained by Alice in 1983 in connection with her deceased husband's estate. At that time Graubard sent Alice a letter confirming its retention:

> "This letter confirms that you have requested and authorized Graubard . . . to provide legal services to you in connection with matters relating to the estate of Mr. Sylvan Lawrence and any other such matters as you may from time to time refer to [Graubard].

> "You shall compensate [Graubard] for services rendered in accordance with [Graubard's] hourly time charges in effect at the time services are rendered. The range of current hourly time charges for [Graubard's] attorneys and legal assistants is $55.00 per hour through $195.00 per hour. My time

---

1. This is, of course, no reflection on the findings of the Referee, whose diligence and scholarship are beyond question. Because I believe the scope of the contingency arrangement presents a question of law for this Court to resolve, it is beyond the scope of the Referee's mandate from the Surrogate.

is charged at $175.00 per hour. You also have agreed to reimburse [Graubard] for any disbursements incurred on your behalf.

"[Graubard] periodically will provide you with interim invoices of services rendered and disbursements incurred."

Alice countersigned this letter and returned it to Graubard.

For the next 22 years, Graubard billed Alice more than $18 million in legal fees incurred in litigation instituted against Cohn (as executor), concerning his administration of the estate,[2] as well as other matters. It is uncontested that Graubard was promptly paid all fees billed to Alice.

In January 2005, when Alice was about 80 years old, the parties executed a modified retainer agreement. By this point, more than $350 million in distributions had been made to the Lawrence estate beneficiaries.

The parties disagree as to whether Graubard was in the midst of settlement negotiations with the Cohn estate at the time the new agreement was executed (although Graubard contests this fact in a memorandum of law rather than an affidavit). Nonetheless, Graubard does concede that Alice had negotiated and tentatively agreed to a $60 million "settlement" with the Cohn estate prior to execution of the modified retainer, but the terms did not achieve the "finality" desired and were eventually rejected.

Like the 1983 agreement, the modified retainer agreement was documented in letter form, and countersigned by Alice:

"1. For the calendar year commencing January 1, 2005, the firm will continue to send you on a quarterly basis invoices for services rendered for the quarter, plus disbursements. Against each such invoice, you will pay the firm a flat sum of no more than $300,000 for that quarter. If at the end of the calendar year our invoices for services rendered for the calendar year, in the aggregate, total less than $1,200,000, exclusive of disbursements, the firm will either credit you with the overpayment or refund to

---

**2.** Sylvan Lawrence owned a one-half interest in over 90 commercial buildings and parcels of real estate, and his brother, Cohn, owned the other half. Cohn was unwilling to fully liquidate the jointly owned properties or Sylvan Lawrence Co., Inc., the company that managed those properties. The result of this dispute was years of litigation.

you such overpayment at your option. If at the end of the calendar year, our invoices for the calendar year, in the aggregate exceed $1,200,000, exclusive of disbursements, you shall have no obligation or liability to the firm for any such excess.

"2. Commencing January 1, 2005, with respect to any monies distributed to the beneficiaries of the Estate of Sylvan Lawrence,[3] the Graubard firm will be paid from your share of such monies 40% of the total distributed to the beneficiaries, minus the total amount paid by you, including fees and disbursements, pursuant to paragraph 1 above.

"3. In the event you settle the litigation with the Cohn estate, with respect to any monies distributed to the beneficiaries pursuant to said settlement, the Graubard firm shall be paid on the same basis as is set forth in paragraph 2 above. Should the amount due to the Graubard firm pursuant to this paragraph 3 be less than the amount of its actual time and disbursement charges commencing January 1, 2005, it is agreed between us that we will arrive at a fair resolution of the shortfall to the Graubard firm, which in all events shall be entirely in your discretion.

"4. Your obligation to make quarterly payments under this agreement shall not extend beyond one year."

On May 18, 2005, about five months after the modified retainer agreement was signed, Graubard reached a settlement in the litigation against former executor Cohn. Pursuant thereto, the Cohn estate was to pay the Lawrence estate approximately $104.8 million. The closing on the settlement agreement took place on July 25, 2005.

On August 5, 2005, Graubard filed a petition in the Surrogate's Court to compel payment of its legal fees. The petition asserted claims against Alice for breach of the 2005 retainer fee agreement in the amount of "40% of not less than $110.3 million plus 40% of any additional sums paid to the [Estate] by the

---

**3.** Graubard claims that the estate had already distributed about $350 million by the point that the modified retainer was entered and comparatively little in estate assets remained, and what did remain was being held as court-ordered reserves, and might never have been distributed.

[Estate of Seymour Cohn] pursuant to a [Stipulation of Settlement dated July 25, 2005], less $348,272.78 paid by [Alice] to Graubard on May 6, 2005, together with statutory interest," or alternatively, quantum meruit legal fees "in an amount equal to 40% of not less than $110.3 million plus 40% of any additional sums paid to the Estate by the Cohn Estate, less $348,272.78 paid by [Alice] to Graubard on May 6, 2005, together with statutory interest." The petition also asserted claims against the current executor, Richard Lawrence, for tortious interference with contract (in inducing his mother's breach of the retainer agreement) and to recoup for legal services benefitting the estate.

Alice and Richard answered the petition, and Alice and her present counsel submitted affidavits. In her affidavit, Alice related, among other things, the events of December 2, 1998: C. Daniel Chill arrived at her home in Ridgefield, Connecticut; he claimed that, given the favorable results that he, along with Elaine Reich and Steven Mallis, had obtained in the estate litigation, they were each entitled to a bonus; and, he explained that this type of bonus payment was routinely made to attorneys based upon excellent service. Alice then made payments to the three attorneys of the firm, defendants Chill, Reich and Mallis, in the amounts of $2,000,000, $1,550,000 and $1,500,000, respectively.

Upon handing the checks to the individual attorneys, however, Chill told her to indicate on the check that this was a "gift" in bold letters. It is uncontroverted that the checks were then deposited into the respective attorneys' personal accounts. Then, in or about April 1999, Chill called Alice and advised her that due to the tax implications of her payments, the bonus amounts due to each of them would be dramatically reduced. Chill stated that in order to assure that the amounts paid over were indeed received in full, it was necessary that she file a gift tax return for 1998 and pay the appropriate taxes on behalf of the three attorneys. This tax amounted to approximately $2,700,000.

Around November 2004, Alice's legal bills were increasing to almost $1,000,000 per quarter.[4] She called Chill expressing concern about the size of those bills and asked about the possibility of entering into a new fee arrangement. Alice claimed that she had a knee replacement in September 2004, and was on pain management services at the time.

---

4. As noted above, in the previous two decades, Graubard billed on average just under $1 million per year. This represents a fourfold increase in the annual billing.

Around January 2005, Chill contacted Alice. There is no dispute that at this point, Graubard was actively negotiating with the attorneys for the Cohn estate to reach a settlement, but Chill represented that the litigation was likely to continue for an additional two years. Chill initially recommended a 50% contingency arrangement, but reduced the fee to 40% when Alice complained about the amount.

Alice's present counsel was retained on July 29, 2005. Graubard's petition was brought a week later. By order dated September 12, 2005, Surrogate Roth referred the application to compel payment of legal fees to the Honorable Howard A. Levine to "hear and report." On September 13, 2005, Alice initiated a separate proceeding, relating to the same facts, in Supreme Court, New York County, against Graubard, and against Graubard partners Chill, Reich and Mallis.

The complaint alleged claims for contract rescission, unjust enrichment, conversion, breach of fiduciary duty, and breach of the covenant of good faith and fair dealing. It also sought an accounting and declaratory relief (with respect to the 2005 retainer agreement). Graubard, Chill, Reich and Mallis responded to the institution of the action in Supreme Court by attempting to remove the Supreme Court action to Surrogate's Court, where their petition was pending. Alice opposed removal on the basis that the Surrogate's Court lacked subject matter jurisdiction over her claims.

Thereafter, in or about October 2005, with leave of the Referee, Alice and Richard submitted motions to dismiss Graubard's petition in the Surrogate's Court proceeding. On November 11, 2005, Graubard submitted a cross motion for partial summary judgment requesting dismissal of Alice's claims that she was entitled to a refund of all fees previously paid to Graubard, Chill, Reich and Mallis, as asserted in her answer to the petition.

On December 14, 2005, Justice Freedman issued an order directing that the Supreme Court action be transferred to Surrogate's Court. Noting the interests of judicial economy, and that the circumstances presented were indistinguishable from *Rosenman & Colin v Winston* (205 AD2d 451 [1994)], the court held that the Surrogate's Court was best suited to resolve this dispute over fees for legal services performed in that court for 22 years.

On March 8, 2006, Justice Roth referred Alice's newly instituted case, recently removed to the Surrogate's Court, again

to Referee Levine to hear and report. Ultimately, the Referee recommended denial of the respective dismissal and summary judgment motions on the grounds that the various issues could not be resolved on motion. The motion court confirmed the Referee's report and recommendations "in their entirety." This was error.

On appeal,[5] Alice contends that the Surrogate's Court lacks subject matter jurisdiction over the claims she initiated in Supreme Court. She also contends that the 2005 retainer agreement is unconscionable on its face and as a matter of law. Alternatively, Alice submits that the Graubard defendants' multiple violations of the Code of Professional Responsibility render the 2005 retainer agreement unenforceable, and that they have forfeited any fee by their conduct. Alice additionally argues that the 2005 retainer agreement violates 22 NYCRR 1215.1. She also claims that Graubard failed to fulfill the requisites of SCPA 2110 since the fees claimed are wholly unreasonable. Finally, Alice submits that the Referee acted outside of his authority by directing her production for deposition.

Richard similarly contends that the agreement is unconscionable and that, given the conduct of Graubard and its partners, it is not entitled to any legal fees. As such, Richard submits that Graubard's claim for tortious interference with contract cannot be sustained. Richard also submits that Graubard failed to state a claim under SCPA 2110 because Alice, not Richard, hired Graubard and agreed to pay for its services.

Pursuant to CPLR 325 (e), "[w]here an action pending in the supreme court affects the administration of a decedent's estate which is within the jurisdiction of the surrogate's court, the supreme court, upon motion, may remove the action to such

---

**5.** It is noted that the Graubard defendants, in their briefs, frequently refer to their memorandum of law for the various factual assertions they make. For example, they refer to the memorandum for the assertion that they recommended that Alice consult an attorney before entering the modified retainer agreement, and that Alice awarded bonuses of her own volition, despite her statements to the contrary. They also refer to the memorandum to support their position that their performance was exemplary in complex litigation.

In an attempt to validate these inadmissible statements, Graubard points to a reference in an affidavit by Mallis, submitted in support of the motion to confirm (and thus, not submitted to the Referee prior to his report). Therein, Mallis incorporated by reference the counterstatement of facts, noting that the facts disputed, among other things, Alice's assertion that she was never advised to seek independent counsel. Ultimately I believe that these factual disputes are irrelevant to a determination that the fee arrangement is outrageous.

surrogate's court . . . ." New York State Constitution, article VI, § 12 (d) states: "The surrogate's court shall have jurisdiction over all actions and proceedings relating to the affairs of decedents, probate of wills, administration of estates and actions and proceedings arising thereunder or pertaining thereto . . . ." (*See also* SCPA 201.)

Alice, citing *Matter of Bourne* (4 Misc 2d 610, 612 [Sur Ct 1957]), claims that the order removing the Supreme Court action to Surrogate's Court was erroneous where: (1) the issues raised by the complaint do not relate to the affairs of the decedent, but instead, affairs of the living; (2) the issues raised in the complaint concern individuals who are not parties to the petition currently pending before the Surrogate's Court; and (3) the decision of the Surrogate's Court on the petition is not necessary for a complete disposition of the subject matter of the complaint. She also notes that she initially attempted to file her action in Surrogate's Court, but her complaint was rejected for filing by the Clerk of the Surrogate's Court.

It is true that all of the parties to this controversy are living, but Alice's claim that the issues raised in the complaint do not relate to the "affairs of the decedent" is simply incorrect. (*Compare Matter of Lupoli*, 237 AD2d 440 [2d Dept 1997] [finding no subject matter jurisdiction where objections raised involved controversy between living persons relating to a matter which did not affect the estate].) The entire controversy stems from her retainer of Graubard to represent her in litigation, spanning over 22 years, against the estate's former executor, Cohn. (*See Rosenman & Colin v Winston*, 205 AD2d 451 [1994] [Surrogate's Court in unique position to determine the amount of fees owed to law firm in light of extensive litigation that has taken place in the court, and could award legal fees from estate if it was shown that firm rendered services that increased the value thereof].) Even her claims against Chill, Reich and Mallis relate to "bonuses" or "fees" paid in relation to this estate litigation.

Further, while Chill, Reich and Mallis may not, individually, be "parties" to the estate proceeding, it is their legal work for Alice which underlies her present dispute with them. Alice claims that these attorneys improperly requested bonuses based on their purportedly "exceptional" performance in the estate litigation. Clearly, her claims against Chill, Reich and Mallis arise from the estate proceeding and relate to their representative capacity as attorneys for Alice, a beneficiary of the Law-

rence estate. While these attorneys allegedly did not disclose these bonuses to Graubard, this purported omission does not disassociate the transaction from the estate administration. (*See Matter of Piccione*, 57 NY2d 278, 288 [1982] [for a surrogate's court to decline jurisdiction it should be abundantly clear that the matter in controversy in no way affects the affairs of a decedent or the administration of the estate].)

Finally, there was already a petition pending in the Surrogate's Court relating to the 2005 retainer agreement and Graubard's entitlement to legal fees thereunder, which was the subject of the Supreme Court action. Further, in the Surrogate's Court proceeding, Alice specifically raised the affirmative defense of unconscionability.

Thus, the Surrogate's Court has subject matter jurisdiction over Alice's Supreme Court action since it arises out of the administration of the estate of Sylvan Lawrence.[6] (*See Matter of Driscoll*, 273 AD2d 381 [2000] [Surrogate in best position to determine which legal fees performed by attorney benefitted estate, and bears ultimate responsibility of deciding what constitutes reasonable legal fees, regardless of existence of a retainer agreement]; *compare Matter of Dicosimo*, 180 Misc 2d 89, 92 [Sur Ct 1999] [where retainer agreement was between objectant and the beneficiary, individually, and invoices were submitted directly to the beneficiary, the beneficiary might be held responsible for the entire fee even though the objectant might not have been able to recover the entire fee from estate funds had the agreement been with the fiduciary of the estate, *and most of the services were rendered in another court involving a dispute between decedent's siblings,* no subject matter jurisdiction exists].) To hold otherwise would result in duplicitous litigation and, perhaps, inconsistent verdicts. (*See Birnbaum v Central Trust Co.*, 156 AD2d 309 [1989] [interests of judicial economy dictate a strong preference for removal where the affairs of an estate are involved].)

The underlying issue of the validity of the retainer agreement is far more troubling. I necessarily start with the undisputed precept that an unconscionable contract is one that is so grossly unreasonable in the light of the mores and business practices of the time and place that it should not be enforced according to

---

**6.** It should be noted that Alice's motion for dismissal of Graubard's petition was also based on lack of subject matter jurisdiction, and was denied by the Referee, who found that subject matter jurisdiction exists. But Alice pursued only an appeal from the Supreme Court order.

its literal terms. (*Gillman v Chase Manhattan Bank,* 73 NY2d 1 [1988].) Generally, a finding of unconscionability requires a showing of procedural deficiencies in the contract formation process (procedural unconscionability), as well as a finding that the substantive contract terms themselves unreasonably favor the more powerful party (substantive unconscionability). (*Id.* at 10.) I disagree with the majority's contention that in this case a trial is required to resolve credibility questions between the parties on the issue of procedural unconscionability. It is beyond cavil that a court may find a provision of a contract so outrageous as to warrant holding it unenforceable on the grounds of substantive unconscionability alone, although this would be an exceptional circumstance. (*Id.* at 12.) This case presents just such a circumstance. Furthermore, the determination of whether a contract is unconscionable is an issue of law for the court to decide. (*See Laidlaw Transp. v Helena Chem. Co.,* 255 AD2d 869, 870 [4th Dept 1998].)

Sheer substantive unconscionability may render a contract unenforceable only in exceptional circumstances. However, this case presents a unique, and closely monitored relationship; that of attorney-client. In regard to attorney fee agreements, "courts as a matter of public policy give particular scrutiny to fee arrangements between attorneys and clients, casting the burden on attorneys who have drafted the retainer agreements to show that the contracts are fair, reasonable, and fully known and understood by their clients." (*Shaw v Manufacturers Hanover Trust Co.,* 68 NY2d 172, 176 [1986].)[7] A contingent fee may be disallowed as between attorney and client, in spite of a contingent fee retainer agreement, where the amount becomes large enough to be out of all proportion to the value of the professional services rendered. (*Gair v Peck,* 6 NY2d 97, 106 [1959].)

Were we to look *only* at the modified retainer agreement, it cannot be said that the agreement is unconscionable as a matter of law. The retainer agreement does not mention the amount of the billing over the last 22 years, the amount remaining in the estate, or the potential or actual recovery against the Cohn

7. Chill's affidavit, submitted in support of Graubard's summary judgment application, sets forth that Alice was happy with the representation provided, from the very beginning affirmatively requested a detailed transcript of services rendered, and never objected to the quality or quantity of services. Otherwise, Graubard's assertions as to lack of procedural unconscionability are contained in Graubard's memorandum of law in opposition to the motions to dismiss.

estate. Thus, Alice and Richard point out the omitted facts, which largely appear in the petition, and the remainder are uncontested. (*See Rovello v Orofino Realty Co.*, 40 NY2d 633 [1976] [under CPLR 3211 a trial court may use affidavits in its consideration of a pleading motion to dismiss]; *see also Biondi v Beekman Hill House Apt. Corp.*, 257 AD2d 76 [1st Dept 1999], *affd* 94 NY2d 659 [2000].)

Taking into account these facts, the modified retainer agreement goes well beyond the limits of all propriety. The modification is to a retainer agreement that has been in place for 22 years. The initial retainer provided for hourly billing, and over the ensuing 22 years, Graubard charged over $18 million in legal fees relating to the litigation, and apparently other matters, all of which was timely paid. At the proverbial eleventh hour, the agreement abruptly and significantly changed, albeit not entirely. Just before a trial date was set, a contingency fee of 40% was negotiated between the parties. Despite this agreement for a contingent fee arrangement, hourly billing was to continue for a year following the retainer agreement, subject to caps in the amounts for which Alice would be responsible. The amount recoverable pursuant to the contingency fee arrangement, however, was not capped.

Thus, Graubard negotiated for 40% of any recovery in the litigation against the Cohn estate (after there was admittedly a $60 million offer made to Alice), as well as 40% of all remaining distributions to beneficiaries (all coming out of Alice's shares) on top of what was already billed ($18 million), which included two appeals. Thus, Graubard provided itself with an additional safety net, i.e., $1.2 million in billing for one more year. Moreover, the Graubard firm must have had a fairly good expectation that the Cohn litigation would settle for a substantial amount, since a $60 million offer had already been placed on the table.

Ultimately, the litigation against the Cohn estate was settled just five months after the revised retainer agreement was signed for more than $100 million. Graubard was thus contemplating a minimum of $40 million in additional fees, the $40 million Alice realized over the $60 million offer. I believe that this fee is unconscionable per se, under the unique circumstances presented, and there is no need to elicit further facts to ascertain same.[8] (*See King v Fox*, 7 NY3d 181, 192 [2006] [besides the sheer

---

8. The Graubard parties unilaterally look to the percentage of their contingency fee, arguing that it is not unconscionable as a matter of law. But this fee, in combination with hourly billing for 22 years, and other factors,

amount of the fee, other factors to consider include circumstances surrounding the agreement, parties' intent, value of services in proportion to fee charged, in hindsight, and perhaps the most important in determining the unconscionability of a contingent fee agreement is whether the client was fully informed upon entering into the agreement with the attorney].)

Regardless of the procedural aspects of the parties' negotiations, no court can condone such an exorbitant fee, where the risks taken by Graubard were virtually nonexistent (having been paid $18 million in legal fees already and negotiated another $1.2 million for the ensuing year, plus its disbursements) and the Graubard firm only added, at most, another seven months of legal work to its 22 years of service. (See Ween v Dow, 35 AD3d 58, 63 [1st Dept 2006] [finding that the "very nature" of the retainer agreement provision, allowing Ween to recover attorneys' fees in collection action, was fundamentally unfair and unreasonable, and was, on its face, unconscionable and unenforceable].) Without the costs and risks generally associated with contingency fee arrangements, such a fee agreement is nothing short of plain greed. (See King, 7 NY3d at 192 [policy behind allowing contingency fee arrangements is based upon providing access to the courts and the fact that attorneys risk their time and resources in endeavors that could prove fruitless].)

Had Graubard negotiated a 40% contingency fee arrangement from the time litigation was commenced, or refunded the amounts already billed, a different result might be warranted. But here, the facts elicited overwhelmingly favor a finding of unconscionability. Further, the Graubard defendants have not pointed to any facts which might warrant a different holding, thereby rendering the need for further inquiry unnecessary.

The Court of Appeals has held that only in a "rare case" will an unconscionable agreement be capable of being ratified. (See King v Fox, 7 NY3d at 193.) This is not such a "rare case."

In addition to arguing that the 2005 retainer agreement is unconscionable, Alice and Richard allege that Graubard, and three partners, Chill, Reich and Mallis, violated various provisions of the Code of Professional Responsibility, which render the retainer agreement unenforceable.

---

renders the agreement unconscionable, without the necessity of a determination as to whether a 40% retainer, alone, is proper. Otherwise, the Graubard parties and the majority claim the need for a full factual record, prior to a determination of unconscionability; I believe that it is an issue that we need not reach.

Initially, it is claimed that the Graubard parties violated Code of Professional Responsibility DR 2-106 (22 NYCRR 1200.11),[9] prohibiting a lawyer from entering an agreement for, charging, or collecting excessive fees. Here, Graubard "charged" $40 million for, at most, seven months of work, after billing hourly for 22 years of previous litigation against the Cohn estate, and despite billing over $300,000 since the agreement's inception (although the retainer agreement provided for a refund of the latter amount). Graubard should never have asked for such a fee. To do so violates Code of Professional Responsibility DR 2-106 (22 NYCRR 1200.11).

Where certain disciplinary violations have been found, courts have held attorneys not entitled to legal fees for any services rendered. (*See Quinn v Walsh*, 18 AD3d 638 [2d Dept 2005] [violation of DR 5-105 (a) (22 NYCRR 1200.24 [a])]; *Decolator, Cohen & DiPrisco v Lysaght, Lysaght & Kramer*, 304 AD2d 86 [1st Dept 2003]; *Matter of Winston*, 214 AD2d 677 [2d Dept 1995] [violation of DR 5-108 (a) (1) (22 NYCRR 1200.27 [a] [1])].) Alice and Richard claim that Graubard should forfeit its fee, and point to *Grimes v Camilli* (238 AD2d 289 [1st Dept 1997], *lv denied* 91 NY2d 805 [1998]) in support of their position. But in *Grimes*, while this Court found a fee agreement unenforceable, it did not specifically find that the attorney was not entitled to any fee.

---

**9.** This provision, in relevant part, sets forth that:

"(b) A fee is excessive when, after a review of the facts, a lawyer of ordinary prudence would be left with a definite and firm conviction that the fee is in excess of a reasonable fee. Factors to be considered as guides in determining the reasonableness of a fee may include the following:

"(1) The time and labor required, the novelty and difficulty of the questions involved and the skill requisite to perform the legal service properly.

"(2) The likelihood, if apparent or made known to the client, that the acceptance of the particular employment will preclude other employment by the lawyer.

"(3) The fee customarily charged in the locality for similar legal services.

"(4) The amount involved and the results obtained.

"(5) The time limitations imposed by the client or by circumstances.

"(6) The nature and length of the professional relationship with the client.

"(7) The experience, reputation and ability of the lawyer or lawyers performing the services.

"(8) Whether the fee is fixed or contingent."

Nonetheless, I believe that this is an appropriate penalty, especially in the context of the outrageousness of the fee "charged" in this case, since it would tend to discourage such conduct. (*Cf. Matter of Cooperman*, 83 NY2d 465, 475 [1994] [deciding issue in disciplinary context only, Court implied no views with respect to the wider array of factors by which attorneys and clients may have fee dispute controversies resolved, and while nonrefundable retainer agreement declared unenforceable and subjected attorney to professional discipline, quantum meruit payment for services actually rendered still available and appropriate].) The period for which the attorney should be required to return/forfeit fees should follow the inappropriate conduct. Thus, Graubard should be deemed to have forfeited any fee as of January 2005.

Yet, determining whether the "gifts" to the Graubard partners also violated this rule is not discernible at this point in the litigation. After all, the checks paid to these partners do document the payments as a "gift," along with the notation of legal services.

Next, Alice and Richard allege a violation of Code of Professional Responsibility DR 5-103 (22 NYCRR 1200.22) in that Graubard acquired a proprietary interest in Alice Lawrence's claim against the Cohn estate. Notably, pursuant to DR 5-103, "reasonable" contingency fees in civil cases are exempted from this section. Nonetheless, it would seem that, since in my view the fee in question was unreasonable, there was also a violation of this rule.[10]

Alice and Richard also allege a violation of Code of Professional Responsibility DR 5-104 (a) (22 NYCRR 1200.23 [a]), in that Graubard entered into a business transaction with its client, and did not suggest that Alice Lawrence consult independent counsel, and did not require that she consent in writing to the terms of the transaction and inherent conflict therein. As noted by the Referee in his report, the "business transaction" rule has not previously been applied to the modification of a

---

**10.** Alice also notes that she stands to recover, at most, approximately 75% of the $110.3 million, and Graubard is demanding 40% of that amount from her alone. She claims that this constitutes over 50% and is presumptively in violation of DR 5-103 (a). (*Landsman v Moss*, 180 AD2d 718 [1992] [agreement not reasonable because it effectively assigns to the plaintiff's attorneys 100% of the plaintiff's recovery up to $12,000, thereby divesting the plaintiff of her interest in the action].) Graubard responds that, as a wealthy parent, it was to her advantage from an estate planning perspective to pay the entire legal fee, which was also noted by the Referee.

retainer agreement. Nonetheless, the United States District Court for the Southern District of New York has suggested its applicability to such a transaction. (*See Naiman v New York Univ. Hosps. Ctr.*, 351 F Supp 2d 257 [SD NY 2005].)

The Graubard defendants argue that this rule is inapplicable since Alice did not expect Graubard to exercise professional judgment on her behalf. As evidence of same, Graubard points to Alice's averments that Chill asked for a 50% contingency fee, but Alice negotiated the fee down to 40% because she thought 50% was too high a percentage. (*See* Roy Simon, Simon's New York Code of Professional Responsibility Annotated, at 691 [2006 ed] [if clients seldom expect their lawyers to exercise professional judgment to protect them when negotiating initial or amended retainer agreements, then DR 5-104 (a) will seldom apply to a modified retainer agreement].)

With respect to this violation, the Graubard defendants have a persuasive argument. Clearly, a client knows that, when entering a retainer agreement, the attorney's interests are inherently at odds with those of the client, and the attorney is not seeking to exercise professional judgment on her behalf. (*But see* Simon's New York Code of Professional Responsibility Annotated, at 694 [2006 ed] [at a minimum, New York courts are likely to agree that a change in fee arrangement in an ongoing representation is subject to strict scrutiny for overreaching by the lawyer].) Thus, I believe that whether or not there was a disciplinary violation is best left in the first instance to the Departmental Disciplinary Committee.

Finally, Alice and Richard assert violations of Code of Professional Responsibility DR 1-102 (a) (7) (22 NYCRR 1200.3 [a] [7]) (attorney shall not engage in any conduct that adversely reflects on the lawyer's fitness as a lawyer) and/or DR 5-101 (22 NYCRR 1200.20) (a lawyer shall not accept or continue employment if the exercise of professional judgment on behalf of the client will or may be affected by the lawyer's own personal interests), when three attorneys of the firm received more than $5 million in "gifts" which went undisclosed to the firm. They point to Code of Professional Responsibility EC 5-5, which recommends that, before accepting a gift, a particular procedure be followed to avoid charges of undue influence and overreaching. (*See also Matter of Buchyn*, 300 AD2d 739 [3d Dept 2002] [gifts from client may create conflict of interest].) They fail to cite any authority for the proposition that an attorney or firm forfeits compensation by receiving an improper gift, although

there are cases denying fees where an attorney proceeds with representation of a client in the face of a conflict of interest.

While Alice's affidavit suggests impropriety in a myriad of factual assertions, I believe that this issue cannot be resolved in a motion to dismiss. This is true even though Graubard, Chill, Mallis and Reich proffer little response to the allegations, other than stating, without an affidavit directly attesting to such, that Alice was acting on her own volition and did not complain until seven years later. Based upon this record though, there is the *appearance* of impropriety and the possibility of a conflict of interest.

Nonetheless, while Alice has alleged that Graubard was unaware of these payments, she has no personal knowledge of same. Further, Graubard has not set forth whether it had knowledge of these payments. As such, there clearly is no basis to disgorge Graubard's fee (pre-2005 retainer) at this point.

FRIEDMAN, MARLOW and NARDELLI, JJ., concur with ANDRIAS, J.P.; CATTERSON, J., dissents in a separate opinion.

Order, Supreme Court, New York County, entered December 16, 2005, affirmed, without costs. Order, Surrogate's Court, New York County, entered July 12, 2006, affirmed, without costs. Order, Surrogate's Court, New York County, entered on or about October 4, 2006, affirmed, without costs.