[851 NE2d 1184, 818 NYS2d 833]

Edward C. King, Appellant, v Lawrence A. Fox, Respondent.

Argued May 11, 2006; decided June 13, 2006

## POINTS OF COUNSEL

*Profeta & Eisenstein,* New York City (*Fred R. Profeta, Jr.,* of counsel), for appellant. I. An attorney, guilty of professional misconduct in the representation of a client, must disgorge all fees paid; his conduct may not be ratified by the client. (*Matter of Phillips,* 284 AD2d 897; *Matter of Lippman,* 232 AD2d 69; *Teichner v W & J Holsteins,* 64 NY2d 977; *Campagnola v Mulholland, Minion & Roe,* 76 NY2d 38; *Orendick v Chiodo,* 272 AD2d 901; *Matter of Stevens,* 252 AD2d 654; *Schwartz v Tenenbaum,* 7 AD2d 866; *Universal Acupuncture Pain Servs., P.C. v Quadrino & Schwartz,* 370 F3d 259; *In re Badger,* 9 F2d 560; *Hendry v Pelland,* 73 F3d 397.) II. Courts have a duty to disallow unconscionable fee agreements, and such agreements may not be ratified by the client. (*Gair v Peck,* 6 NY2d 97; *Newman v Silver,* 553 F Supp 485, 713 F2d 14; *Dunn v H.K. Porter Co., Inc.,* 602 F2d 1105; *In re Agent Orange Prod. Liab. Litig.,* 818 F2d 226; *Landsman v Moss,* 180 AD2d 718; *Wade v Clemmons,* 84 Misc 2d 822; *Matter of Cox v Scott,* 10 AD2d 32; *Greene v Greene,* 56 NY2d 86; *McCoy v Gas Engine & Power Co.,* 135 App Div 771; *Shaw v Manufacturers Hanover Trust Co.,* 68 NY2d 172.) III. Neither an unconscionable fee arrangement nor professional misconduct can be ratified by a client during a period of continuous representation. (*Demov, Morris, Levin & Shein v Glantz,* 53 NY2d 553.)

*Richard M. Maltz, PLLC,* New York City (*Richard M. Maltz*

and *David Hammer* of counsel), for respondent. I. Appellant should not be permitted to raise a disgorgement argument which was not implicated by the questions certified by the Second Circuit, not raised in the summary judgment motion that is the basis for this appeal, and requires this Court to make findings of fact. II. Precedent that denies an attorney a legal fee if discharged for cause does not authorize the disgorgement of an entire legal fee after a successful litigation based upon misconduct incidental to the representation. (*Teichner v W & J Holsteins,* 64 NY2d 977; *Matter of Stevens,* 252 AD2d 654; *Orendick v Chiodo,* 272 AD2d 901; *First Natl. Bank of Cincinnati v Pepper,* 454 F2d 626; *De Luccia v Village of Monroe,* 180 AD2d 897; *Campagnola v Mulholland, Minion & Roe,* 76 NY2d 38.) III. The law of ratification applies to attorney-client contracts. (*Blinn v Schwarz,* 177 NY 252; *Bankers Trust Co. v Litton Sys., Inc.,* 599 F2d 488; *Greene v Greene,* 80 AD2d 55, 56 NY2d 86.) IV. Ratification may occur during a period of continuous representation because the doctrine does not apply to the law of ratification. (*Glamm v Allen,* 57 NY2d 87; *Borgia v City of New York,* 12 NY2d 151; *Greene v Greene,* 80 AD2d 55, 56 NY2d 86; *Schlanger v Flaton,* 218 AD2d 597; *Luk Lamellen U. Kupplungbau GmbH v Lerner,* 166 AD2d 505; *Ruggiero v Powers,* 284 AD2d 593; *Naetzker v Brocton Cent. School Dist.,* 50 AD2d 142.) V. Postnullification fraud does not nullify the ratification. VI. A client may ratify an unconscionable attorney's fee agreement because a client may ratify any fee agreement that is not void. (*Shiya v National Comm. of Gibran,* 381 F2d 602.)

**OPINION OF THE COURT**

Ciparick, J.

The United States Court of Appeals for the Second Circuit has asked us, by means of three certified questions, whether New York law permits a client to ratify an attorney's fee agreement during a period of continuous representation; whether such ratification is possible if attorney misconduct has occurred; and whether a client can ratify an unconscionable fee agreement.

I.

The 30-year relationship between the parties has been summarized by the Second Circuit essentially as follows. In November 1972, plaintiff Edward C. King, a musician and songwriter, became a member of the rock band Lynyrd Skynyrd. Upon joining the band, King contributed to writing, arranging

and performing some of its most popular songs, including, "Sweet Home Alabama." In 1974, the band and its members entered into an exclusive recording agreement with MCA Records, Inc. under which MCA would collect royalties and pay them to the band. During the period from 1974 to 1975, artist's royalties exceeded $1,000,000 per annum. At that time, King received only writer's royalties since artist's royalties were being used to buy out Al Kooper, the band's manager.

Before King became a member, the band had recorded 24 songs at a studio in Muscle Shoals, Alabama. In 1974, the band had King overdub[1] guitar parts on 17 of these songs that eventually became known as the "Muscle Shoals Masters." The band subsequently transferred its rights in these masters to MCA. In May 1975, King left the band due to a deteriorating relationship with its leader, Ronnie Van Zant. King then sought to determine his right to royalties through the band's attorney, but was unsuccessful.

In August 1975, King sought the advice of a New York entertainment lawyer, who secured an advance on King's writer's royalties and retained one third of the advance as his fee. King believed that he was also due artist's royalties because the buyout of Kooper likely was complete. The entertainment lawyer advised King that he would need a litigator to determine his right to artist's royalties and referred King to Lawrence A. Fox, Esq.

In October 1975, King met with Fox in New York City. Fox explained that he was a personal injury lawyer who had little experience in entertainment law. His fee was not discussed at this meeting. Shortly after that meeting, Fox contacted the band's attorney, who (Fox testified) told him that King was not entitled to any royalties, that King owed the band money and that she would not cooperate in providing information. At a meeting the following month, Fox advised King that he planned to pursue discovery of the agreements among the parties to determine King's rights. At this meeting, Fox stated that he would represent King on a one-third contingency basis because, according to King, he was in "dire financial straits and had no money for a retainer." King testified that he was under the impression that the fee would be taken only from whatever ac-

---

1. "[T]o transfer (recorded sound) onto a recording that bears sound recorded earlier in order to produce a combined effect" (Merriam Webster's Collegiate Dictionary 829 [10th ed 1993]).

cumulated royalties were recovered, not from future royalties. No other fee arrangement was discussed at this meeting.

On November 26, 1975, Fox sent King a retainer letter that stated: "[The] fee for services in this matter will be a contingency fee, based upon any money recovered from the defendants. Our fee for representing you will be 1/3 of the recovery, whether by way of settlement, trial, judgment or other method." King signed the letter agreement and returned it to Fox.

On February 10, 1976, Fox obtained a copy of the exclusive recording agreement with MCA. The agreement required MCA to pay royalties directly to King and also provided that royalties would not be suspended in the event a member left the band. Thus, the agreement appeared to render MCA defenseless against King's assertion that he was entitled to royalties. On September 30, 1976, Fox initiated a lawsuit against MCA, seeking the unpaid (artist's) royalties (according to King, writer's royalties were discontinued by MCA after the initiation of the lawsuit). In January 1977, MCA answered and, in April 1977, it impleaded Sir Productions, Inc., the band's manager, who claimed that King owed it 20% of his royalties. King claims that the manager's entitlement to a portion of his royalties was the only issue in contention. Fox, on the other hand, asserts that MCA mounted a "vigorous defense" and that he had to use compulsory process in order to obtain discovery.

In August 1978, a proposed settlement of the litigation was reached. The settlement agreement provided for a lump sum payment of King's past-due royalties and periodic future royalties to be paid directly to King. MCA, however, retained 20% of the past-due royalties in escrow with its law firm, representing the amount of the cross claim interposed by Sir Productions. The escrowed amount was later reduced to 10% after Fox settled the Sir Productions claim.

King and Fox discussed the proposed settlement agreement by telephone. In that conversation, Fox advised King that under the fee agreement Fox would be entitled to one third not only of all past royalties recovered, but also of all future royalties. King recalled that he was "shocked and surprised" at this revelation but did not pursue the issue since obtaining the settlement funds was of "utmost importance" to him. At this time, King told Fox that his wife wanted her family's attorney in New Jersey, John K. Groon (now deceased), to review the settlement documents.

Meanwhile, Groon had sent a letter to Fox advising him that he was King's local counsel and that he would like to review the settlement documents. Fox wrote Groon that he had spoken to Groon's associate and that as far as they were both concerned, all questions were answered. Fox also stated that he should contact him to expedite the settlement and that time was of the essence:

> "By November 11, 1978 I must serve a summons and complaint on Sir Productions, Inc., otherwise MCA will deposit the money into court as a stakeholder with the City of New York. If that happens, we will have to pay MCA's legal fees, the money will not earn interest, and when the matter is ultimately resolved it will take a long time plus a fee on Ed [King]'s behalf to receive the money back from the New York City Treasury."

In fact, this was a misrepresentation. Pursuant to the settlement agreement, the monies were not to be deposited into court but would remain in escrow. On October 23, 1978, Fox sent Groon a second letter saying that "[t]he one third recovery we receive includes all royalty money Ed [King] is entitled to resulting from his involvment [sic] with [the band] as that was our agreement." This letter concluded with an additional request that Groon call Fox if further discussion was needed.

King signed the settlement documents at Groon's office. King asserts that Groon wanted to review all of the papers, but that Fox's statement that he had until November 11, 1978 to avoid the stakeholder proceeding caused King to panic and accept settlement, and that King therefore told Groon to have nothing more to do with the matter. On October 25, 1978, Groon sent a letter to Fox enclosing the executed settlement documents. Shortly thereafter, Groon died. After King received the settlement proceeds, he visited Fox at his New York office to discuss the fee arrangement. King relates that during his visit he was "blown away" when Fox showed him six crates of what Fox said were papers relating to his lawsuit. King asserts that Fox made him "feel embarrassed to bring up the fee arrangement" issue, which he did not.

After the 1978 settlement, MCA began to pay King both artist's and writer's royalties semiannually. The payments were sent to Fox who deducted his one-third share and remitted the remainder to King with a cover letter making a specific reference to the one-third payment to Fox's law firm for legal fees.

In 1981, King requested that Fox represent him in another matter concerning the Muscle Shoals Masters at which time there was no discussion of fees. The parties presumed that Fox would take one third of whatever was recovered. The following year, Fox brought an action against MCA demanding the artist's royalties due to King. The matter was finally settled in 1989 and MCA began paying King royalties for the work done on the Muscle Shoals Masters. In the late 1980s, Fox also represented King in a dispute between the estates of former band members in federal District Court in Atlanta. Fox "traveled to Atlanta for three days, where he worked with King's local counsel" and participated in "settlement conferences on King's behalf until the matter was eventually resolved in or around 1989."

The fee arrangement continued uninterrupted from 1979 to 1987. The topic, however, arose again in 1986 when King mentioned it to Fox during a telephone conversation. King relates that when he mentioned the fee agreement, Fox stated that he fought hard to win back King's royalties and that King should be grateful. Fox allegedly went on to state that the fee arrangement was related to the 1978 settlement agreement which had been approved by the judge and that he was unable to modify it even if he wished. King contends that this statement caused him to believe that a court order obligated him to pay Fox the one third of his royalties. No such order exists. King further states that he was "strongly intimidated" from raising any further issues about the fee agreement. Fox denies making any statement that the fee agreement was connected to the 1978 settlement order.

In 1987, King wrote to Fox asking him to stop withholding one third of his writer's royalties, which he had been doing since the 1978 settlement, as the writer's royalties were never in jeopardy. Although Fox agreed to discontinue taking one third of King's writer's royalties in the future, he did not return any of the $55,000 already collected.

In 1988, King was audited by the Internal Revenue Service (IRS). King asked Fox to confirm their one-third fee arrangement, which Fox did in a letter to the IRS dated April 18, 1988. Moreover, on January 31, 1990, King wrote a letter to Fox expressing his appreciation for his help and anticipating future legal problems with MCA. King's letter concludes with the statement that "you'll be hearing from me!" Indeed, in 1991, Fox once again represented King on several other matters relating to King's association with the rock band Strawberry Alarm

Clock. There was little contact after this, other than the correspondence from Fox to King remitting King's share of the periodic royalty payments.

In 1995, MCA contacted King to verify his address, and at King's request, MCA changed the delivery instructions for his royalty checks to his address. As a result, King's royalty checks were sent directly to him, and thus Fox was unable to deduct his one-third share. King eventually realized that he was receiving the full share of his artist's royalties. King stated that he was afraid that he was violating "a court order of some kind" by denying Fox his fee, but made no effort to give Fox his one-third share.

On February 21, 1997, Fox finally contacted King to demand his one-third share of the artist's royalties. King explained to Fox that he no longer had the money, and did not contact Fox again. King then enlisted the services of yet another attorney, who opined that Fox had taken advantage of King for years by collecting an illegal annuity, and this litigation ensued several months later. Over 17 years, Fox collected more than $104,000 in contingency payments from the two settlements—representing past royalties—approximately $368,000 from King's future artist's royalties, and $55,000 from his writer's royalties for a total of $527,000.

## II.

On June 4, 1997, King filed a complaint against Fox in the United States District Court for the Southern District of New York alleging that the one-third fee agreement with Fox was unconscionable, claiming breach of fiduciary duty, unjust enrichment, undue influence, conversion, and attorney delinquency in violation of New York Judiciary Law § 487 (misconduct subject to misdemeanor conviction and treble damages). King demanded that Fox disgorge all fees he collected, plus interest, as well as punitive damages and he sought rescission of the fee agreement. Fox answered the complaint in December 1997 and counterclaimed for an accounting of his share of the artist's royalties that King had withheld since 1995 when MCA began sending the royalty checks directly to King.[2]

2. In September 2000, in a trial of the counterclaim, a jury ruled in King's favor. Fox initially appealed the order but subsequently withdrew his appeal. Thus, the counterclaim judgment in King's favor is final. It should be noted that, as a result of King having prevailed in the counterclaim trial and no ap-

In May 1998, Fox moved for summary judgment based on the untimeliness of King's claim. The District Court granted summary judgment to Fox and dismissed the complaint on the ground that King's lawsuit was barred by the six-year statute of limitations governing the fee agreement. The Court of Appeals for the Second Circuit vacated and remanded the matter finding that King "raised a genuine issue of material fact as to whether Fox continued to represent him, thus tolling the statute of limitations on King's claim" (28 Fed Appx 95, 99 [2002]).

More depositions were taken and the District Court once again granted Fox summary judgment, rejecting King's unconscionability argument, among others. The District Court accepted Fox's argument that King ratified the fee agreement since he had accepted payment of royalties pursuant to the agreement with Fox for 17 years. King appealed and on August 2, 2005, the Second Circuit affirmed the judgment in part and certified the following three questions:

> "1. Is it possible for a client to ratify an attorney's fee agreement during a period of continuous representation?

> "2. Is it possible for a client to ratify an attorney's fee agreement during a period of continuous representation if attorney misconduct has occurred during that period? If so, can ratification occur before the attorney has committed the misconduct?

> "3. Is it possible for a client to ratify an unconscionable attorney's fee agreement?" (418 F3d 121, 137 [2d Cir 2005].)

We answer all three questions "yes," but with significant qualifications. We have not been asked, nor do we decide, whether a valid ratification occurred in this case.

### III.

Having found continuous representation through at least 1991, and having further found that the action was not time-barred, the Second Circuit asks whether a client may ratify an attorney-client fee agreement during a period of continuous representation, and whether ratification is possible if the attorney has committed fraud or other misconduct during that period. King maintains that such a fee agreement can never be ratified.

---

peal having been taken by Fox, no future payment for legal fees from royalty checks will be made to Fox.

In proving ratification, the burden is on the attorney to establish that the client acquiesced in the agreement "with full knowledge of all the material circumstances known to the attorney," and that such acquiescence was not brought about by fraud on the attorney's part, or misconception on the part of the client (*Greene v Greene*, 56 NY2d 86, 92 [1982]; *see also Kent v Quicksilver Min. Co.*, 78 NY 159, 190 [1879]). Although some other jurisdictions have not permitted ratification of attorney fee agreements because of the nature of the attorney-client relationship (*see Walton v Hoover, Bax & Slovacek, L.L.P.*, 149 SW3d 834, 846-847 [Tex Ct App 2004]; *Blattman v Gadd*, 112 Cal App 76, 97, 296 P 681, 689 [1st App Dist 1931]), we do not agree that such an arrangement is in all circumstances immune from ratification.

Indeed, some New York courts have already recognized the ratification doctrine as applying to attorney-client agreements (*see Greene v Greene*, 80 AD2d 55, 59 [1st Dept 1981], *affd* 56 NY2d 86 [1982] [no ratification unless it be shown client approved act of attorney with knowledge that client allegedly had a cause of action against attorney]; *Schlanger v Flaton*, 218 AD2d 597 [1st Dept 1995] [attorney misconduct and a continuing business relationship of three years not enough time to warrant imposition of ratification defense]). Appellate courts from other jurisdictions have also held that a client may ratify what otherwise would be a breach of an attorney's fiduciary duty (*see Saggese v Kelley*, 445 Mass 434, 837 NE2d 699 [2005]; *Rippey v Wilson*, 280 Mich 233, 273 NW 552 [1937]; *Monco v Janus*, 222 Ill App 3d 280, 583 NE2d 575 [1991]) so long as the client is competent and fully informed of the relevant facts. As the Supreme Judicial Court of Massachusetts wrote, "[r]atification is not the preferred method to obtain a client's consent to a fee-sharing agreement, but it is adequate" (*Saggese*, 445 Mass at 442, 837 NE2d at 705).

■ But can ratification occur during a period of continuous representation? In New York, the continuous representation doctrine tolls the statute of limitations when professional malpractice is alleged. We have never held that the ratification doctrine can be suspended during a continuous period of representation, and we refuse to do so here. The Second Circuit noted that if this were a typical contract case, King's eight years of acquiescence from 1978 to 1986 with full knowledge of the terms of the agreement would be enough under New York law to show ratification. We see no reason why the existence of continuous

representation should unsettle traditional contract principles in this case.

 Thus, although continuous representation may in some cases toll the statute of limitations, it cannot preclude ratification of an attorney fee agreement. Ratification may occur at any time, so long as a client has full knowledge of the relevant facts (including the terms of the agreement and the choice to disavow it) and has acquiesced. The fact that the agreement's terms may be more advantageous to the attorney does not change the result. Nor is the result necessarily different if misconduct occurs during the period of continuous representation, so long as the client's acquiescence is not procured as a result of the misconduct. Obviously, a ratification induced by misconduct would be invalid.

IV.

Turning to the final inquiry—whether a client may ratify an unconscionable agreement—at common law an unconscionable agreement was one that no promisor (absent delusion) would make on the one hand and no honest and fair promisee would accept on the other (*see* Black's Law Dictionary 75 [8th ed 2004]). In general, an unconscionable contract has been defined as one which is so grossly unreasonable as to be unenforcible because of an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party (*see Gillman v Chase Manhattan Bank*, 73 NY2d 1, 10 [1988]). Such contracts are usually voidable since a party to a contract has the power to validate or ratify the contract, as well as the power to avoid it (*see* 1 Corbin on Contracts § 1.6, at 17-18 [1993 rev ed]).

In regard to attorney fee agreements, "courts as a matter of public policy give particular scrutiny to fee arrangements between attorneys and clients, casting the burden on attorneys who have drafted the retainer agreements to show that the contracts are fair, reasonable, and fully known and understood by their clients" (*Shaw v Manufacturers Hanover Trust Co.*, 68 NY2d 172, 176 [1986]). A "[c]ontingent fee[ ] may be disallowed as between attorney and client in spite of [a] contingent fee retainer agreement[ ], where the amount becomes large enough to be out of all proportion to the value of the professional services rendered" (*Gair v Peck*, 6 NY2d 97, 106 [1959]). Here, the Second Circuit identified the sheer amount of the fee Fox collected as an element that might justify a finding of unconscionability.

Contingent fee agreements between attorneys and their clients, however, generally allow a client without financial means to obtain legal access to the civil justice system. In entering into contingent fee agreements, attorneys risk their time and resources in endeavors that may ultimately be fruitless. Moreover, it is well settled that "the client may terminate [the contingent fee agreement] at any time, leaving the lawyer no cause of action for breach of contract" (*Gair*, 6 NY2d at 106) only quantum meruit (*see Campagnola v Mulholland, Minion & Roe*, 76 NY2d 38, 43-44 [1990]).

It is inherently difficult to determine the unconscionability of contingent fee agreements because at the time of agreement, the precise amount of recovery is still unknown. As such, it is not necessarily the agreed-upon percentage of the recovery due the attorney or the duration of the recovery that makes a contingent fee agreement unconscionable (*see Matter of Fitzsimons*, 174 NY 15 [1903] [attorney's fee of one half of the recovery does not render the agreement unconscionable]; *see also Beatie v DeLong*, 164 AD2d 104 [1st Dept 1990] [contingent fee agreement fair and enforceable where attorney was to receive 30% of revenue generated by patents in futuro]), but rather the facts and circumstances surrounding the agreement, including the parties' intent and the value of the attorney's services in proportion to the fees charged, in hindsight (*see Gross v Russo*, 47 AD2d 655 [2d Dept 1975]).

To assist in determining at what point a contingent fee agreement becomes unconscionable or unreasonable, the Legislature has enacted a statute, and the Appellate Divisions of the Supreme Court have promulgated joint rules, for establishing the reasonableness of contingent fee agreements (*see* Judiciary Law §§ 474, 474-a; Code of Professional Responsibility DR 2-106 [b] [22 NYCRR 1200.11 (b)] [listing factors to be considered as guide in determining reasonableness of fee]; DR 5-103 [a] [2] [22 NYCRR 1200.22 (a) (2)] [allowing for a contingent fee in civil cases]).

█ Besides the sheer amount of the fee, another factor to consider—and perhaps the most important—in determining the unconscionability of a contingent fee agreement, is whether the client was fully informed upon entering into the agreement with the attorney. Here, the Second Circuit says there exists a dispute as to whether Fox explained the full ramifications of the agreement at the time it was signed. However, ratification by definition occurs only *after* the initial agreement was made.

Because of the special protections given to clients in dealing with their attorneys, it will be a rare case where an unconscionable agreement may be ratified by the client, but we are not prepared to say it can never occur. Where a fully informed client with equal bargaining power knowingly and voluntarily affirms an existing fee arrangement that might otherwise be considered voidable as unconscionable, ratification can occur so long as the client has both a full understanding of the facts that made the agreement voidable and knowledge of his or her rights as a client.

Accordingly, the certified questions should be answered in accordance with the foregoing writing.

Chief Judge KAYE and Judges G.B. SMITH, ROSENBLATT, GRAFFEO, READ and R.S. SMITH concur.

Following certification of questions by the United States Court of Appeals for the Second Circuit and acceptance of the questions by this Court pursuant to former section 500.17 of the Rules of Practice of the Court of Appeals (22 NYCRR former 500.17 [now 22 NYCRR 500.27]), and after hearing argument by counsel for the parties and consideration of the briefs and record submitted, certified questions answered in accordance with the opinion herein.