LAURENCE PARNOFF *v.* DARCY YUILLE
(AC 32545)

Robinson, Espinosa and Bishop, Js.

148

Argued May 24—officially released November 20, 2012

*Thomas J. Weihing*, with whom, on the brief, was *John T. Bochanis*, for the appellant-appellee (plaintiff).

*Barbara L. Cox*, for the appellee-appellant (named defendant).

*Opinion*

BISHOP, J. The issues raised in this appeal and cross appeal require us to assess whether an attorney who executes a contingency fee agreement with a client for payment of a fee greater than that prescribed by General Statutes § 52-251c,[1] commonly known as the "fee cap

[1] In 1986, the General Assembly enacted § 52-251c as part of Public Acts 1986, No. 86-338, commonly known as Tort Reform I. Section 52-251c provides in relevant part: "(a) In any claim or civil action to recover damages resulting from personal injury, wrongful death or damage to property occurring on or after October 1, 1987, the attorney and the claimant may provide by contract, which contract shall comply with all applicable provisions of the rules of professional conduct governing attorneys adopted by the judges of the Superior Court, that the fee for the attorney shall be paid contingent upon, and as a percentage of: (1) Damages awarded and received by the claimant; or (2) the settlement amount received pursuant to a settlement agreement.

"(b) In any such contingency fee agreement such fee shall be the exclusive method for payment of the attorney by the claimant and shall not exceed an amount equal to a percentage of the damages awarded and received by the claimant or of the settlement amount received by the claimant as follows: (1) Thirty-three and one-third per cent of the first three hundred thousand dollars; (2) twenty-five per cent of the next three hundred thousand dollars; (3) twenty per cent of the next three hundred thousand dollars; (4) fifteen per cent of the next three hundred thousand dollars; and (5) ten per cent of any amount which exceeds one million two hundred thousand dollars.

"(c) Notwithstanding the provisions of subsection (b) of this section, a claimant may waive the percentage limitations of said subsection if the claim or civil action is so substantially complex, unique or different from other wrongful death, personal injury or property damage claims or civil actions as to warrant a deviation from such percentage limitations. . . .

"(e) No waiver of the percentage limitations of subsection (b) of this section shall be valid unless the contingency fee agreement (1) is in writing, (2) sets forth in full the fee schedule of subsection (b) of this section, (3) contains a conspicuous statement, printed in boldface type at least twelve points in size [that the claimant knowingly and voluntarily waives the fee schedule] . . . and (4) is signed and acknowledged by the claimant before a notary public or other person authorized to take acknowledgments.

"(f) If a claimant waives the percentage limitations of subsection (b) of this section pursuant to this section, in no event shall (1) the total fee under the contingency fee agreement exceed thirty-three and one-third per cent

statute," may, nevertheless, recover against the client in a breach of contract action where the allowable damages are limited, by jury instruction, to the maximum allowed under the fee cap statute. The plaintiff, Laurence Parnoff, appeals from the judgment of the trial court rendered in part after a jury trial, in favor of the plaintiff as against the defendant Darcy Yuille.[2] On appeal, the plaintiff claims that: (1) § 52-251c does not apply to the claims he was retained to assert on behalf of the defendant; (2) the application of the limitations prescribed by § 52-251c to the facts of this case violates the federal constitution; (3) the contract could not be abrogated by the defendant after the plaintiff had fully performed; and (4) the court improperly failed to charge the jury on the issue of ratification of the contract by the defendant. In response, the defendant filed a cross appeal in which she claims that: (1) it was incorrect for the court to have submitted the contract claim to the jury because enforcement of the fee agreement at issue, even with an instruction limiting permissible damages, violates the public policy of § 52-251c; (2) in submitting the contract to the jury with an instruction limiting any damages to amounts allowable under the fee cap statute, the court impermissibly reformed the fee agreement under scrutiny; and (3) there was insufficient evidence to sustain the jury's award of punitive

of the damages awarded and received by the claimant or of the settlement amount received by the claimant, and (2) the claimant be required to repay any costs that the attorney incurred in investigating and prosecuting the claim or civil action if there is no recovery.

"(g) No fee shall be payable to any attorney who seeks a fee that exceeds the percentage limitations of subsection (b) of this section unless the claimant has waived such limitations pursuant to this section and the contingency fee agreement complies with the requirements of subsection (e) of this section. . . ."

[2] Prior to trial, the court granted a motion to intervene as a defendant filed by attorney Laura M. Mooney, who provided legal services to Yuille in conjunction with a workers' compensation claim on Yuille's behalf that underlies these appeals. See footnote 5 of this opinion. Because Mooney is not a party to these appeals, we refer in this opinion to Yuille as the defendant.

damages and prejudgment interest. We reverse the judgment of the trial court.

The jury could have reasonably found the following facts. On December 5, 1998, the plaintiff and the defendant entered into a contingent fee retainer agreement through which the defendant retained the plaintiff "to prosecute a claim for injuries and damages resulting" from Bridgeport Hospital's (hospital) allegedly bad faith handling of the defendant's workers' compensation claim. The fee agreement provided for a contingent fee of 40 percent "in place of an hourly charge of $240.00 for work performed." The percentage of recovery set forth in the fee agreement exceeds the cap set forth in the fee cap statute. By way of a complaint dated November 16, 1998, the plaintiff brought a claim against the hospital on behalf of the defendant.[3] The claim contained three counts. The first count, for wrongful discharge, alleged, in essence, that the hospital had wrongfully terminated the employment of the defendant, a hospital nurse, as a retaliatory reaction to her workers' compensation claim and that, as a consequence, she had sustained financial damages and losses and also that she had sustained injury, including "the exacerbation of her medical condition . . . physical, mental and psychological stress . . . embarrassment and humiliation; and . . . emotional distress." The second count alleged that the hospital's conduct had been reckless and intentional and repeated the damages allegations of the first count. The third count set forth a claim based on the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq., and also repeated the damages claims set forth in the first count. Subsequently, the parties to the action against the hospital agreed to submit the claims set forth in

---

[3] Neither the plaintiff nor the defendant makes any claim of relevance that the plaintiff appears to have commenced work for the defendant before the fee agreement was executed.

the first two counts to binding arbitration.[4] The three person arbitration panel issued its decision on June 29, 2004, in which the panel found in favor of the hospital on count one of the complaint alleging wrongful discharge. As to the second count, alleging that the hospital had engaged in intentional and reckless conduct in response to Yuille's workers' compensation filing, the panel stated: "On Count Two of the complaint, we find in favor of [Yuille] and award damages in the amount of One Million Ninety Six Thousand Thirty Two and 93/100 ($1,096,032.93) Dollars." Thereafter, the plaintiff sent an invoice to the defendant in which he itemized his billing, indicating the gross settlement amount, allowable expenses, and an attorney's fee of $484,446.10 that represented 40 percent of the gross settlement proceeds. In response, the defendant returned the invoice to the plaintiff with a note as follows: "Dear Larry—The enclosed statement is acceptable with the exception of your legal fee. I authorize you to take $125,000 toward your legal fee. The remaining amount needs to be placed in an escrow account with both our names on the account until Laura Mooney's fee is paid and my objection to the 40 [percent] fee is resolved. Yours—Darcy Stevens Yuille."[5]

[4] The record of this case does not contain an explanation of the fate of the third count setting forth a CUTPA claim. It is clear, however, that only the first two counts were submitted to binding arbitration.

[5] Laura M. Mooney is an attorney who provided legal services to the defendant in conjunction with the underlying workers' compensation claim and whose representation of the defendant overlapped, in some ways, with that of the plaintiff. Mooney was a named defendant in that action on the basis of the plaintiff's claim that she had interfered in his contractual relationship with Yuille. In response, Mooney filed a counterclaim in which she sought recovery from the plaintiff on the basis of quantum meruit, alleging, in essence, that her work had contributed to Yuille's arbitration success. The jury found in favor of Mooney on the plaintiff's claim and awarded her a modest sum in response to her quantum meruit claim. No appeal from the jury's determination regarding Mooney has been taken.

Additionally, we note that collateral litigation between Laurence V. Parnoff and Mooney resulted in an appeal and an opinion by this court in 2011. See *Parnoff* v. *Mooney*, 132 Conn. App. 512, 35 A.3d 283 (2011). The plaintiff asserts on appeal that the defendant's loyalty to attorney Mooney was mis-

The record thereafter reflects an exchange of correspondence that did not bring a final resolution to the fee dispute.[6] Having failed to reach an accord, the plaintiff, on March 9, 2005, filed a three count complaint against the defendant as follows. The first count sets forth a breach of contract claim based on the written fee agreement and the result achieved in binding arbitration. The second count, although captioned "unjust enrichment," sets forth a claim more properly viewed as one in quantum meruit, as it repeats the assertions of the first count and adds to them the statement that "[t]he reasonable value of the Plaintiff's services was $438,413.17."[7] The third count, captioned "Bad Faith,"

placed and unjustified and, that her insistence that attorney Mooney be paid from the arbitration proceeds was the principal motivation in her refusal to pay him 40 percent of the settlement proceeds as initially agreed. While that is perhaps factually informative, we do not attach legal significance to the defendant's relationship with Mooney or Mooney's involvement, if any, in the underlying litigation, as there is no claim on appeal that Mooney has any entitlement to the sums in dispute. Furthermore, we believe that the defendant's motivation for insisting that the plaintiff's fee be capped by § 52-251c is not legally germane to a resolution of the issues on appeal.

[6] It appears from the record that on November 27, 2004, the plaintiff disbursed the sum of $611,586.83 to the defendant representing the gross settlement less expenses and $125,000 toward legal fees and that the disputed sum of $313,413.17 was placed in escrow.

[7] We are mindful that while quantum meruit and unjust enrichment are allied common-law principles and that both doctrines may apply in the same situation, however, they are not simply different terms with an identical meaning. While unjust enrichment focuses on the propriety of a payee or beneficiary retaining funds or a benefit, quantum meruit's primary focus is on the value of services rendered. The doctrine of unjust enrichment arises in a variety of situations in which the court, using its equity power, determines that it would be inequitable for a payee to retain funds or a benefit in its possession. "That doctrine is based upon the principle that one should not be permitted unjustly to enrich himself at the expense of another but should be required to make restitution of or for property received, retained or appropriated. . . . The question is: Did [the party liable], to the detriment of someone else, obtain something of value to which [the party liable] was not entitled?" (Internal quotation marks omitted.) *Culver* v. *Culver*, 127 Conn. App. 236, 249–50, 17 A.3d 1048, cert. denied, 301 Conn. 929, 23 A.3d 724 (2011). The application of the allied doctrine of quantum meruit arises, generally, in a situation in which the plaintiff has provided services to the defendant for which the defendant has refused to pay. "Quantum meruit is the remedy available to a party when the trier of fact determines that an

repeats the essential allegations of the first count and adds to them the claim that the defendant's conduct was "intentional, willful, in bad faith and in reckless disregard of the injury, financial damage and emotional distress to the Plaintiff . . . ." Through this action, the plaintiff claimed money damages, attorney's fees, punitive damages, equitable relief, interest and costs. In response, the defendant filed an answer and two special defenses to all counts. In her first special defense, she alleged that the fee agreement was unenforceable as a matter of law because it violated the prescriptions of § 52-251c. In her second special defense, she alleged that the fee sought by the plaintiff was excessive and unconscionable. The plaintiff replied to the special defenses with a general denial of their allegations. Notably, the plaintiff did not allege, by way of reply, that the defendant had waived the protections of § 52-251c or that she had ratified the contract by her conduct subsequent to entering into it.

Following the evidentiary portion of the trial and argument by counsel, the court instructed the jury, inter alia, on the laws of contract and unjust enrichment. With respect to the contract claims set forth in the first and third counts, the court provided a standard instruction regarding the law of contract to include a discussion, generally, of the law relating to the existence and breach of contract and an overview of the law of damages for a breach of contract. With respect to the third count, based on an intentional or reckless breach, the court provided a general instruction on the

implied contract for services existed between the parties, and that, therefore, the plaintiff is entitled to the reasonable value of services rendered. . . . The pleadings must allege facts to support the theory that the defendant, by knowingly accepting the services of the plaintiff and representing to her that she would be compensated in the future, impliedly promised to pay her for the services she rendered." (Internal quotation marks omitted.) *Total Aircraft, LLC* v. *Nascimento*, 93 Conn. App. 576, 582 n.5, 889 A.2d 950, cert. denied, 277 Conn. 928, 895 A.2d 800 (2006).

law of punitive damages. Following its charge on the plaintiff's complaint, the court discussed the claim set forth in the defendant's first special defense that the contract violated the provisions of § 52-251c. In this part of its instruction, the court recited the fee limiting provisions of the statute. The court also instructed the jurors that the provisions of § 52-251c would be applicable in the event that they find that the plaintiff and the defendant had entered into a contract that was later breached by the defendant. In pertinent part, the court stated: "The action which the plaintiff brought on behalf of defendant Yuille included claims covered by the statute. Accordingly, the provisions of the statute apply to the contingent fee agreement between the plaintiff and defendant Yuille." Immediately thereafter, the court instructed the jury on the law of waiver, informing the jury that the law contemplated that a party could waive the protections of the fee cap statute and that, if the jury found that the defendant had waived the statutory protections, the plaintiff's right to recover compensatory damages would not be so limited. The court stated, as well, that if the jury found that the defendant had not waived the statutory cap provisions, the plaintiff's right to compensatory damages would be limited by the statutory terms.[8]

As a supplement to its charge and in order to provide the jury a pathway to its deliberations and decision

---

[8] The court's charge on waiver included the following: "However, because that statute involved private rights of plaintiffs and not the rights of the public, our courts have held that a plaintiff can waive the application of the cap and agree to pay a contingent fee at a higher rate than that permitted under the statute." In addition to its contextual explanation of the law of waiver, the court stated: "If you find that defendant Yuille waived her rights under the statute, then you must find for the plaintiff on defendant Yuille's first special defense." And, the court stated as well: "If you find in favor of defendant Yuille with respect to her first special defense, then you are entitled to reduce any compensatory damages which may be otherwise due to the plaintiff under this first and second counts to the maximum fee authorized under the statute less the payment of $125,000, which he acknowledges he received."

making, the court submitted a series of interrogatories to the jury. In sum, the jury found, with respect to the first count, that the plaintiff and the defendant had entered into a contingency fee agreement and that the agreement was not excessive, unconscionable and unenforceable. The jury found, as well, that the defendant did not waive the provisions of § 52-251c and, therefore, as instructed, awarded the plaintiff the sum of $139,404.94 less the sum of $125,000 already paid to the plaintiff, representing the maximum fee allowable under the fee cap statute.[9]

As to the third count alleging that the defendant's breach of contract was intentional, the jury, in response to an interrogatory, found that the defendant's breach was "wanton, malicious and egregious with reckless disregard for [the] [p]laintiff's property right" and, accordingly, awarded punitive damages to the plaintiff in the amount of $75,000. Finally, the jury awarded prejudgment interest to the plaintiff in the amount of $37,639.33. With respect to interrogatories concerning the second count, captioned "Unjust Enrichment," the jury was instructed to answer the relevant interrogatories only if it found in favor of the defendant on the

[9] The interrogatories and answers regarding the amount of damages due under the first count were as follows: "Did the defendant Darcy Yuille prove by a preponderance of the evidence that the contingent fee which the plaintiff seeks to collect from the defendant Darcy Yuille was excessive, unconscionable and unenforceable." To this question, the jury responded, "No." The next question was: "Did the plaintiff prove by a preponderance of the evidence that defendant Darcy Yuille knowingly waived the applicability of Connecticut General Statutes § 52-251c, which imposes limits on contingent fees which may be charged by an attorney?" To this question, the jury answered, "No." The instructions on the interrogatory following question three, then stated:

"If the answer is 'yes', proceed to [part I A 4]. If the answer is 'no', enter a plaintiff's verdict in the amount of $139,404.94 (the amount of a contingency fee under the statutory scale less the payment of $125,000 already received by the plaintiff), and proceed to [part B 1]." With respect to count three alleging an intentional breach of contract, the jury found in favor of the plaintiff and made an award of punitive damages as well as prejudgment interest.

plaintiff's contract claim. Accordingly, the jury did not answer interrogatories regarding the defendant's conduct on the issue of unjust enrichment.[10]

Following the jury's verdict, the plaintiff filed a motion captioned "Motion to Reconsider and Set Aside Finding of Applicability of [General Statutes] § 52-251c," in which he asserted that the fee cap statute was not applicable to his handling of a bad faith claim against the defendant's employer, the hospital, that its application under these facts is unconstitutional and that the fee agreement was binding on the plaintiff and the defendant because the plaintiff had completed performance of his obligations under the agreement. In response, the defendant filed an objection to the

---

[10] The jury did, however, place a check mark on the line for a defendant's verdict under the second count regarding unjust enrichment in the plaintiff's verdict form given to the jury by the court. Even if we assume that the jury followed the court's instructions not to reach the unjust enrichment claim should the jury find in favor of the plaintiff in regard to the existence of a contract and a breach, we place no significance in the jury's notation on the plaintiff's verdict form. Contrary to the defendant's argument, we do not view this notation as a determination on the merits. Because, however, neither the plaintiff nor the defendant has asked that the matter be remanded for a hearing on the unjust enrichment count, we do not need to resolve whether a lawyer, barred from contract recovery because of the contract's failure to comply with the fee cap statute, may nevertheless bring an action in quantum meruit. It is our impression, however, that the Supreme Court's decision in *Gagne* v. *Vaccaro*, 255 Conn. 390, 766 A.2d 416 (2001), does not apply. There, the court opined that an attorney discharged by a client may seek fees from a succeeding attorney on the basis of quantum meruit even in the absence of a written fee agreement. In such a situation, however, because the client's gross fees are fixed by the fee agreement entered into with the succeeding attorney, the public policy concerns of § 52-251c are not implicated. Such is not the case were we to permit a recovery based on quantum meruit by an attorney who is prevented from recovering for the breach of a contract made unenforceable by the provisions of the fee cap statute. To permit a recovery in quantum meruit in such a situation would, as a practical matter, render the statutory limits of the fee cap statute a meaningless legislative gesture. Nevertheless, because neither the plaintiff nor the defendant has asked that the matter be remanded for retrial on the second count, we need not decide whether such an action would lie in these circumstances.

plaintiff's motion. She also filed a separate motion to set aside the verdict and for judgment notwithstanding the verdict through which she argued that the verdict on the first count should be set aside on the ground that the contract was void as against public policy and therefore not enforceable. She claimed, as well, that by allowing the jury to consider the plaintiff's contract claims while also instructing the jury to limit any damages award in accord with the provisions of the fee cap statute, the court impermissibly reformed the contract. Additionally, the defendant claimed that, for the same reasons as she urged the court to set aside the jury verdict on the first count, the jury's determinations and awards regarding her bad faith breach of the contract could not stand. She also urged the court to set aside the awards of punitive damages and prejudgment interest on the basis of evidentiary insufficiency. After the court denied counsel's postverdict motions and rendered judgment in accordance with the jury's verdict, these appeals ensued.

We first consider the issue raised in the plaintiff's appeal that § 52-251c does not apply to the fee agreement under scrutiny. Because that issue requires us to interpret the statute and to determine whether the undertaking for which the plaintiff and the defendant entered into a fee agreement was covered by the statute, our review is plenary. See *Yeager* v. *Alvarez*, 134 Conn. App. 112, 118, 38 A.3d 1224 (2012).

"When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . In seeking to determine that meaning, General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other

statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . The test to determine ambiguity is whether the statute, when read in context, is susceptible to more than one reasonable interpretation." (Internal quotation marks omitted.) *Fennelly* v. *Norton*, 294 Conn. 484, 492–93, 985 A.2d 1026 (2010).

Section 52-251c (a) expressly pertains to claims or civil actions "to recover damages resulting from personal injury, wrongful death or damage to property" and provides for a cap on fees for such cases. Additionally, subsection (b) of the statute provides in relevant part: "In any such contingency fee arrangement such fee shall be the exclusive method for payment of the attorney by the claimant . . . ." General Statutes (Rev. to 1997) § 52-251c (b). The thrust of the plaintiff's argument regarding the applicability of the statute is that he undertook representation of the defendant in a bad faith claim against the hospital and that such a claim does not meet the statutory definition of a "claim or civil action to recover damages resulting from personal injury, wrongful death or damage to property . . . ." General Statutes § 52-251c (a). Contrary to the plaintiff's assertion, the complaint filed on behalf of the defendant against her hospital employer sought damages for personal injury. The plaintiff makes no argument that the complaint was not a civil action, nor does he deny seeking to recover damages from the defendant. He asserts, rather, that he was not seeking damages for personal injury but rather for the bad faith handling of her workers' compensation claim. In making this argument, however, the plaintiff appears to ignore the pleadings he filed. There, he alleged in each count,

whether framed as wrongful discharge, reckless/intentional conduct or as a CUTPA violation: "As a further result of the aforesaid acts and omissions of the defendant, the plaintiff has and continues to sustain injury, including: (a) the exacerbation of her medical condition; (b) physical, mental and psychological stress; (c) embarrassment and humiliation; and, (d) emotional distress." And, as a result of these injuries, the complaint included a demand for monetary damages on behalf of Yuille. Under any reasonable and common definition of the terms, these allegations represent claims for personal injuries for which monetary damages were sought. In sum, the complaint filed by counsel for Yuille against the hospital was a civil action in which counsel sought to recover damages resulting from personal injury. Such a complaint squarely falls within the ambit of § 52-251c.

The plaintiff next claims that § 52-251c as applied to the underlying facts, is unconstitutional as a violation of article first, § 10, of the United States constitution.[11]

---

[11] The constitution of the United States, article first, § 10, provides in relevant part: "No State shall enter into any Treaty, Alliance, or Confederation; grant Letters of Marque and Reprisal; coin Money; emit Bills of Credit; make any Thing but gold and silver Coin a Tender in Payment of Debts; pass any Bill of Attainder, ex post facto Law, or Law impairing the Obligation of Contracts, or grant any Title of Nobility. . . ."

The plaintiff claims, also, that the application of the statute violates the separation of powers doctrine and his rights to due process and equal protection. These constitutional claims, however, were not made at trial and, thus, have not been preserved for appellate review. Additionally, the plaintiff has not asked this court to accord them extraordinary review. See *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989); see also *Perricone* v. *Perricone*, 292 Conn. 187, 212 n.24, 972 A.2d 666 (2009) (affirming that *Golding* doctrine applies to civil as well as criminal cases). Accordingly, these claims are not appropriate for review.

Also, with respect to the plaintiff's article first, § 10 argument concerning the impairment of contracts, the plaintiff appears to argue that because the revision of the statute in effect when the contract was made did not include a provision for a client to waive the fee cap provisions and the current revision of the statute contains a waiver provision, the earlier revision must have been unconstitutional because the legislature must be presumed to have acted with purpose in later creating a waiver provision. We need not

Although the constitutional contract impairment language appears to be absolute, jurisprudence on this portion of the constitution has established that the constitutionality of state action affecting contract rights must be assessed in context. The Supreme Court of the United States has stated: "Unlike other provisions in [article first], it is well settled that the prohibition against impairing the obligation of contracts is not to be read literally." *Keystone Bituminous Coal Assn.* v. *DeBenedictis*, 480 U.S. 470, 502, 107 S. Ct. 1232, 94 L. Ed. 2d 472 (1987); see also *Home Building & Loan Assn.* v. *Blaisdell*, 290 U.S. 398, 428, 54 S. Ct. 231, 78 L. Ed. 413 (1934). "Thus, a finding that there has been a technical impairment is merely a preliminary step in resolving the more difficult question whether that impairment is permitted under the Constitution." *United States Trust Co.* v. *New Jersey*, 431 U.S. 1, 21, 97 S. Ct. 1505, 52 L. Ed. 2d 92 (1977). "The threshold inquiry is whether the state law has, in fact, operated as a substantial impairment of a contractual relationship." (Internal quotation marks omitted.) *Energy Reserves Group, Inc.* v. *Kansas Power & Light Co.*, 459 U.S. 400, 411, 103 S. Ct. 697, 74 L. Ed. 2d 569 (1983). Factors to be weighed are the severity of the impairment, the extent to which it frustrates a party's reasonable contractual expectations and the extent to which the subject matter of the impairment has been regulated in the past. Id. If the impairment is minimal, the inquiry may end at the embryonic stage. *Allied Structural Steel Co.* v. *Spannaus*, 438 U.S. 234, 245, 98 S. Ct. 2716, 57 L. Ed. 2d 727 (1978); *Connecticut Education Assn., Inc.* v.

address the plaintiff's novel argument in this regard, as the record reflects that, notwithstanding the absence of a waiver provision in the applicable revision of § 52-251c, the court, indeed, did charge the jury, on the issue of waiver, that the fee cap provisions would not apply if the jury found that the plaintiff had waived the statute's protections. Given our disposition of these appeals, we need not assess the propriety of this charge where the applicable statute then had no waiver provision.

*Tirozzi*, 210 Conn. 286, 302, 554 A.2d 1065 (1989). Furthermore, our Supreme Court has previously stated that "[§ 52-251c] was intended to regulate the attorney-client relationship in order to protect plaintiffs from excessive legal fees." *Berry* v. *Loiseau*, 223 Conn. 786, 830 n.22, 614 A.2d 414 (1992). Legislative history is in accord. See 48 S. Proc., Pt. 14, 2005 Sess., p. 4409, remarks of Senator Andrew J. McDonald ("because of the strong public policy interests we have as a state, we have put parameters around the circumstances under which that statutory formula can be exceeded"); see also 29 S. Proc., Pt. 10, 1986 Sess., pp. 3465–66, remarks of Senator Thomas F. Upson; 29 H.R. Proc., Pt. 16, 1986 Sess., pp. 5831–33, remarks of Representative Robert G. Jaekle.

In sum, because the constitutional prohibition regarding the impairment of contracts is not absolute, in a challenge of any government limitation on contracts, we examine the extent of the impairment caused by the imposition of statutory limitations and assess the propriety of those limitations in light of the stated purpose of the legislation. Here, as has been noted, the remedial purpose of the legislation is to protect the public from overreaching attorneys. The impairment does not restrict a client's access to counsel; rather, it limits the fees counsel may charge in specified circumstances. The plaintiff has not demonstrated, nor can we find, that the fee cap statute constricts the availability of competent and willing attorneys, nor has the plaintiff demonstrated that such limitations serve to dissuade members of the public from availing themselves of legal representation. Given the stated regulatory purpose of the statute and the public benefit it espouses, we yield to the judgment of the legislative branch regarding this modification of a person's right and reciprocally, that of an attorney, to freely contract with one another for the undertaking of legal representation on a contingency fee basis in certain types of civil actions. In short,

the fee cap statute does not constitute an unconstitutional deprivation of the right to contract.

Also, with respect to the plaintiff's article first, § 10 argument concerning the impairment of contracts, the plaintiff argues that the revision of the statute in effect at the time he and the defendant entered into the agreement unconstitutionally infringed on their ability to contract because it did not include a provision permitting a client to waive the fee cap as the current revision of the statute now does.[12] The simple answer to the plaintiff's claim in this regard is that the issue was made moot by the court's charge to the jury on the issue of waiver. The record reflects that the court charged the jury that the defendant could, in fact, waive the fee cap provision and, in response, the jury made a specific finding that the defendant did not waive the statutory provisions. Accordingly, whether the statute at the time was constitutionally infirm by not including a provision for waiver is irrelevant in this instance, as its alleged infirmity did not burden the plaintiff's case.[13]

The plaintiff next claims that the court incorrectly refused to instruct the jury on the issue of ratification.

[12] Public Acts 2005, No. 05-275, § 1, amended § 52-251c by adding a new subsection authorizing a client to waive the percentage limitations in the statute under specified circumstances.

[13] The court charged the jury after instructing it that the statute pertained to the plaintiff's representation of the defendant: "However, because that statute involved private rights of plaintiffs and not the rights of the public, our courts have held that a plaintiff can waive the application of the cap and agree to pay a contingent fee at a higher rate than that permitted under the statute." Although the statute in effect at the time did not contain a waiver provision, a trial court had opined that the statute might be constitutionally infirm as unreasonably interfering with the right to contract if the parties to such a contract could not waive its fee cap provisions. See *In re Estate of Salerno*, 42 Conn. Sup. 526, 630 A.2d 1386 (1993). We need not comment on the propriety of this charge, given the absence of waiver language in the revision of the statute applicable at the time. We note, simply, that a waiver charge was given, thus rendering meaningless the plaintiff's claim in this regard.

He claims that there was an evidentiary underlayment for a charge on ratification because the defendant admitted, during her testimony, that even though she had been aware of the fee cap statute and that the agreement called for fees greater than allowed by the fee cap, she nevertheless continued to utilize the plaintiff's services, which resulted in the beneficial arbitration award. Therefore, the plaintiff claims, even if the fee agreement violated the limitations of § 52-251c, the defendant should be prevented from asserting those limitations in defense of counsel's fee claims because, by her behavior, she ratified the terms of the fee agreement. In response, the defendant claims that the plaintiff was not entitled to a jury instruction on ratification because he did not specially plead it and because the evidence was insufficient to warrant such a charge.

"As a general rule, [r]atification is defined as the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account. . . . Ratification requires acceptance of the results of the act with an intent to ratify, and with full knowledge of all the material circumstances. . . . In order to ratify the unauthorized act of an agent and make it effectual and obligatory upon the principal, the general rule is that the ratification must be made by the principal with a full and complete knowledge of all the material facts connected with the transaction to which it relates . . . . Since ratification in a given case depends ultimately upon the intention with which the act or acts, from which ratification is claimed, were done, and since intention is a mental fact and its finding clearly one of fact, the finding in a given case of ratification is one of fact . . . ." (Citations omitted; internal quotation marks omitted.) *Il Giardino, LLC* v. *Belle Haven Land Co.*, 254 Conn. 502, 530–31, 757 A.2d 1103 (2000); see also *Updike, Kelly & Spellacy, P.C.* v. *Beckett*, 269 Conn. 613, 639 n.21, 850 A.2d 145 (2004). "[T]he

jury may find that a party ratified a transaction only if the jury finds an intent to ratify it." *Russell* v. *Dean Witter Reynolds, Inc.*, 200 Conn. 172, 186, 510 A.2d 972 (1986). Furthermore, ratification requires "acceptance of the results of the act with an intent to ratify, and with full knowledge of all the material circumstances . . . ." *Ansonia* v. *Cooper*, 64 Conn. 536, 544, 30 A. 760 (1894); see also *Botticello* v. *Stefanovicz*, 177 Conn. 22, 28, 411 A.2d 16 (1979); *Cohen* v. *Holloways', Inc.*, 158 Conn. 395, 411, 260 A.2d 573 (1969). Because this claim involves the legal propriety of the court's jury instructions, our review is plenary. See *Pickering* v. *Rankin-Carle*, 103 Conn. App. 11, 19, 926 A.2d 1065 (2007).

In the procedural context of this claim, we need not explore whether the doctrine of ratification applies to an agreement that is against public policy. Rather, we decide this issue, as did the trial court, on the ground that the issue was not properly raised by the plaintiff. The record reflects that the court denied the plaintiff's request to instruct the jury on the issue of ratification because the plaintiff had not alleged ratification in response to the defendant's special defense of the fee cap statute. The court reasoned that because the plaintiff had failed to plead the defendant's alleged ratification, he was not entitled to the requested charge. Indeed, our review of the pleadings reveals that although the defendant raised, as a special defense, that the fee agreement violated the fee cap provisions of § 52-251c, the plaintiff filed only a general reply denying the allegations of the answer and special defenses. Practice Book § 10-47, however, entitled "Evasive Denials," provides: "Denials must fairly meet the substance of the allegations denied. Thus, when the payment of a certain sum is alleged, and in fact a lesser sum was paid, the defendant cannot simply deny the payment generally, but must set forth how much was paid to the defendant; and where any matter of fact is alleged with

divers circumstances, some of which are untruly stated, it shall not be sufficient to deny it as alleged, but so much as is true and material should be stated or admitted, and the rest only denied." Additionally, Practice Book § 10-50, entitled "Denials; Special Defenses," provides in relevant part: "No facts may be proved under either a general or special denial except such as show that the plaintiff's statements of fact are untrue. Facts which are consistent with such statements but show, notwithstanding, that the plaintiff has no cause of action, must be specially alleged. . . ."

The teaching of these provisions is that matters of avoidance must be specially pleaded. Here, even though the defendant raised as a special defense that the fee agreement violated the fee cap statute, the plaintiff merely denied the special defense and made no claim that the defendant had ratified her obligation under the agreement. Thus, we agree with the trial court that by failing to specifically reply to the special defense regarding the fee cap statute, the plaintiff failed, as well, to put the question of ratification at issue at trial. Our conclusion in this regard does not reflect a rigid adherence to form over substance. Rather, it comports with the notion that parties to litigation should be adequately apprised of each other's claims in order to pursue and defend their causes properly. In this instance, if the plaintiff had replied to the defendant's special defense of the fee cap statute with a claim that the defendant had, nevertheless, ratified the agreement, the defendant could, in turn, have raised the issue of whether ratification applies to an agreement against public policy, and the court, in turn, could have confronted and resolved the issue away from the pressure of an ongoing trial.[14]

[14] That challenging question does not appear to have yet been answered in Connecticut. Although there are cases involving ratification when an agreement is entered into under duress or undue influence; see *Young* v. *Data Switch Corp.*, 231 Conn. 95, 646 A.2d 852 (1994); *Gengaro* v. *New Haven*, 118 Conn. App. 642, 984 A.2d 1133 (2009); we have not found Connecticut appellate decisional law on the question of whether a contract against public

The notion that rules of procedure play a meaningful role in assuring a fair litigation process is particularly apt in the circumstance of this case. Having determined that the fee agreement at issue was subject to the strictures of § 52-251c and constitutionally proper, and that, by its terms, it required payment of fees greater than allowed by the statute, and having determined that the court properly declined to charge the jury on the issue of ratification, we turn next to the issues raised by the defendant's cross appeal.

The defendant claims, on cross appeal, that the verdict on the first count must be set aside as violative of public policy. Specifically, she claims that the court should not have submitted the first count to the jury because the contract violated the prescriptions of § 52-251c and that the court effectively reformed the parties' contract by allowing the jury to consider the plaintiff's contract claim while limiting the amount of allowable damages to the level of fees prescribed by the fee cap statute. The defendant also claims, in regard to the third count, which alleged a wilful breach of the fee agreement, that the evidence was insufficient to support the jury's awards of punitive damages and prejudgment interest. Because we agree with the defendant's claims regarding the submission of the contract to the jury, we need not reach the subordinate issues regarding punitive damages and interest flowing from the defendant's wilful breach of the contract. Because the defendant's first claim concerns the propriety of the court's instructions to the jury, thus raising a question of law, our review on appeal is plenary. See *Pickering* v. *Rankin-Carle*, supra, 103 Conn. App. 19.

The defendant argues that by submitting the plaintiff's contract based claims to the jury, the court effectively permitted the jury to enforce a contract that

policy may nevertheless be found to be binding on the basis of ratification. See *King* v. *Fox*, 7 N.Y.3d 181, 851 N.E.2d 1184, 818 N.Y.S.2d 833 (2006), and cases cited therein for a related discussion.

violates public policy. One could argue, however, that because the court limited the damages the jury could assess to the level of fees prescribed by the statute, the court's instruction did not, in fact, invite enforcement of a contract in violation of public policy. Rather, it could be argued that the court simply limited the damages to allowable amounts, thus conforming the terms of the fee agreement to law. On this point, we agree with the defendant.

We turn first to the language of the statute. In pertinent part, § 52-251c provides: "(b) In any such contingency fee agreement such fee shall be the exclusive method for payment of the attorney by the claimant and shall not exceed an amount equal to a percentage of the damages awarded and received by the claimant or of the settlement amount received by the claimant as follows: (1) Thirty-three and one-third per cent of the first three hundred thousand dollars; (2) twenty-five per cent of the next three hundred thousand dollars; (3) twenty per cent of the next three hundred thousand dollars; (4) fifteen per cent of the next three hundred thousand dollars; and (5) ten per cent of any amount which exceeds one million two hundred thousand dollars." There is no dispute in the case at hand that the fee agreement called for a contingency fee of 40 percent, an amount greater than allowed by the fee cap statute. We believe, therefore, that the import of the statutory language is that a fee agreement that required payment of fees greater than permitted by the fee cap statute was not enforceable because such a contract would fall within the definition of "any such contingency fee agreement," which, by the language of § 52-251c, would be the "exclusive method for payment of the attorney by the claimant . . . ." General Statutes (Rev. to 1997) § 52-251c (b).

Public policy considerations support this view. If, as has been stated, the purpose of the legislation when

enacted was to protect the public from overreaching attorneys, enforcement of an overreaching fee agreement would violate such a policy even where recovery is limited to the statutory amounts because such a result would create no disincentive for an over-reaching attorney and no corresponding public benefit. In other words, if an attorney could be assured of a fee no less than the amount provided by the fee cap statute, such an attorney, if unscrupulous, would have no reason, based in law, to limit fees to the statutory prescribed amount because enforcement of the contract in accordance with the statutorily permitted amount would simply become the lowest possible fee recoverable. That outcome, however, does not comport with the statute's stated purpose.

The statute in question, § 52-251c, was amended in 2005 to permit, under prescribed circumstances, a fee agreement providing for a higher percentage recovery where the statutory range has been waived. Additionally, the 2005 amendment provided the following new subsection: "No fee shall be payable to any attorney who seeks a fee that exceeds the percentage limitations of subsection (b) of this section unless the claimant has waived such limitations pursuant to this section and the contingency fee agreement complies with the requirements of subsection (e) of this section." Public Acts 2005, No. 05-275, § 1.

The plaintiff may argue that this amendment represents a change in the statute and that because the amendment was not enacted until after the fee agreement under scrutiny was signed, the agreement is enforceable. Although a review of legislative history suggests that the 2005 amendment represented a change from the original act: "This changes the rules on that, makes the fee in excess of one-third impossible or illegal and provides much stricter scrutiny of fee agreements, which exceed the existing tort reform limits, which

apply to all negligence cases"; 48 H.R. Proc., Pt. 31, 2005 Sess., p. 9445, remarks of Representative Michael P. Lawlor; we do not believe that the 2005 amendment reflected any change in the policy of the act. In other words, by tightening the language of the statute in 2005, the General Assembly simply made explicit what public policy considerations suggest was implicit in the original legislation requiring that attorneys must comply with the mandates of the fee agreement statute in order to be paid on the basis of written fee agreements they ask clients to execute. Indeed, a review of the legislative history suggests that the primary impetus for the 2005 amendment to the statute came from a Superior Court decision in which Judge Vertefeuille had opined that the statute might be constitutionally infirm if it did not permit parties to waive its fee cap provisions. See *In re Estate of Salerno*, 42 Conn. Sup. 526, 630 A.2d 1386 (1993). From the report of judiciary committee chairman McDonald, it appears that the amendments, in this regard, were intended to accommodate Judge Vertefeuille's concerns but also to very tightly and narrowly prescribe the basis on which waiver could be effectuated and the consequences for charging an amount in excess of the fee caps without a valid waiver. In reporting to the Senate, Senator McDonald stated: "And in particular . . . this section arises from the situation where individuals who contract with attorneys, who have contingency fee arrangements, sometimes exceed the statutory attorney's fee schedule that currently exists in our law. We tried to take that law, and also address the decision in [*Salerno*], which essentially said that private individuals have an opportunity, if they wish, to exceed the statutory framework for attorney's fees. And in this section . . . we acknowledge that fact, but because of the strong public policy interests we have as a state, we have put parameters around the circumstances under which that statutory formula can

be exceeded. . . . [I]n no circumstances, if the statutory framework that currently exists is going to be exceeded, could an attorney enter into a contingency fee arrangement with a client that would compensate that attorney for more than 33 1/3 [percent] of a recovery or judgment." 48 Sen. Proc., Pt. 14, 2005 Sess., pp. 4408–4409, remarks of Senator McDonald.

In the case at hand, however, by permitting the jury to consider the breach of contract claim based on an improper fee agreement and then limiting the plaintiff's damages to amounts prescribed by the fee cap statute, the court effectively reformed the fee agreement to permit a recovery premised on a contract that violated public policy. Based on the history of the act and the public policy it embraces, we believe, there was no legal or policy laden basis for the court to have reformed the contract so as to make a contract against public policy nevertheless enforceable. Rather, the court should not have permitted the jury to consider the plaintiff's contract based claim. Accordingly, the jury's verdict on the contract counts cannot stand.

Finally, we come to the defendant's cross appeal regarding punitive damages and prejudgment interest awarded pursuant to the jury's finding that the defendant wilfully and recklessly breached her contractual obligation to the plaintiff. Our assessment of this claim is guided by our reasoning regarding the contract claim set forth in the first count. In short, if the plaintiff is not entitled to recover on a contract that violates public policy, it is of no legal relevance that the defendant's breach may have been wilful because the contract, as written, imposed no legal obligation on her. Accordingly, the judgment as it relates to punitive damages and prejudgment interest, having no legal basis independent of the fee agreement, cannot stand.

The judgment in favor of the plaintiff on the breach of contract counts is reversed and the case is remanded with direction to dismiss those counts of the complaint.

In this opinion the other judges concurred.